# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

CITGO PETROLEUM CORP.,

           *Plaintiff,*

v.

PETROLEUM LOGISTICS SERVICE CORP., and JOSE MANUEL GONZALEZ TESTINO,

           *Defendants.*

**Civil Case No. 4:20-cv-01820**

**Jury Trial Demanded**

## <u>PLAINTIFF CITGO PETROLEUM CORP.'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS</u>

Jennifer Hardy
Attorney-in-Charge
Texas Bar No. 24096068
Southern District of Texas Bar No. 2828253
Willkie Farr & Gallagher LLP
600 Travis Street
Houston, TX 77002
Tel: (713) 510-1766
Fax: (713) 510-1799
JHardy2@willkie.com

Michael J. Gottlieb
Robert J. Meyer
Nicholas Reddick
Andrew English
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

*Attorneys for Plaintiff CITGO Petroleum Corporation*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 2

  I. Factual Background: PLS And Testino's Scheme To Defraud CITGO ......... 5

    A. *PLS, Testino, And Their Agents Devised A Bribery And Bid-Rigging Scheme To Defraud CITGO* ................................................................. 7

    B. *PLS And Testino Contractually Agreed To Follow All Laws, Not Pay Bribes Or Provide Gifts, And To Disclose Any Related Parties* ....................... 10

    C. *After Executing The Agreement, PLS And Testino Continued To Bribe CITGO Officials To Obtain Business For PLS And Testino-Controlled Companies* ........................................................................................ 12

    D. *PLS And Testino's Bribery And Self-Dealing Cost CITGO Over $84.8 Million* ............................................................................................... 15

  II. Procedural History ................................................................................ 17

ARGUMENT ................................................................................................... 20

  III. The Required Steps Prior To A Default Judgment Have Been Completed ............................................................................................. 22

  IV. The *Lindsey* Factors Weigh In Favor Of Entering A Default Judgment ............................................................................................. 22

  V. Liability: The Complaint Establishes Each Of CITGO's Claims Against PLS And Testino ...................................................................... 26

    A. *PLS Breached Its Agreement With CITGO* ......................................... 27

      1. Texas Law Applies Under Choice Of Law Analysis ......................... 27

      2. CITGO And PLS Entered Into A Valid Contract Under Which CITGO Fully Performed ................................................................ 28

      3. PLS Breached The Agreement In Three Ways .................................. 29

        a. PLS Breached Its Agreement With CITGO By Failing To Comply With Applicable Laws ................................................................. 29

        b. PLS Breached Its Agreement With CITGO By Providing Payments And Gifts To CITGO Employees ................................................... 32

c. PLS Breached Its Agreement With CITGO By Failing To Disclose Conflicts Of Interest ........................................................................ 33

4. CITGO Was Damaged By PLS's Breaches ........................................ 35

B. *PLS Fraudulently Induced CITGO To Enter Into The Agreement* ...................... 36

C. *PLS And Testino Are Liable To CITGO For Their Civil RICO Violations* ......... 40

1. PLS And Testino Were Associated With An Enterprise Engaged In Interstate And Foreign Commerce And Participated In The Enterprise's Affairs Through A Pattern Of Racketeering In Violation Of RICO ............... 41

a. PLS And Testino Are Persons And Are Distinguishable From The RICO Enterprise ........................................................................... 41

b. PLS And Testino Formed An Association-In-Fact Enterprise ..................... 42

c. The Enterprise Formed By PLS And Testino Engaged In Interstate Commerce And Activities Affecting Interstate Commerce .......................... 44

d. PLS And Testino Participated In And Conducted The Enterprise's Affairs .................................................................................. 45

e. The Association-In-Fact Enterprise Formed By PLS And Testino Engaged In A Pattern Of Racketeering Activity ..................................... 46

i. PLS And Testino Engaged In Racketeering Activity ............................... 46

ii. PLS And Testino's Conduct Constitutes A Pattern Of Racketeering Activity .................................................................. 51

f. CITGO Was Injured By PLS's And Testino's RICO Violations ................. 52

i. But For PLS's And Testino's RICO Violations, CITGO Would Not Have Been Injured .......................................................... 52

ii. PLS's And Testino's RICO Violations Were The Proximate Cause Of CITGO's Injuries .................................................................. 53

2. PLS And Testino Conspired To Associate With An Enterprise Engaged In Racketeering Activity ........................................................... 55

VI. REMEDIES:  CITGO HAS MET ITS BURDEN DEMONSTRATING THAT IT IS ENTITLED TO COMPENSATORY AND TREBLE DAMAGES .......................................... 56

A.  *CITGO Is Entitled To Monetary Damages As A Result Of PLS And Testino's Breaches Of Contract, Fraud, And RICO Violations* ......................... 57

1.  CITGO Is Entitled To Compensatory Damages Under Its Breach Of Contract, Fraud, And RICO Claims ................................................................. 58

a.  CITGO Suffered $84.8 Million In Compensatory Damages Caused By Defendants' Bribery Scheme .......................................................... 62

i.   Inflated Prices Defendants Caused CITGO To Pay To Testino-Controlled Entities for Goods ................................................... 63

ii.  Inflated Commissions Paid By CITGO ..................................... 66

iii. Inflated Reimbursable Expenses Paid By CITGO ................... 68

2.  CITGO Is Entitled To Treble Damages Under RICO From Both PLS And Testino ....................................................................................................... 70

3.  CITGO Elects To Receive Treble Damages Against PLS Under RICO .......... 70

4.  CITGO Is Entitled To Prejudgment Interest On Its RICO Damages .............. 72

B.  *CITGO Should Receive Post-Judgment Interest On The Entire Judgment* ......... 74

**CONCLUSION** ......................................................................................................... **75**

Plaintiff CITGO Petroleum Corporation ("Plaintiff," "CITGO," or the "Company") hereby moves for entry of a default judgment against Defendant Petroleum Logistics Service Corp. ("PLS") and Defendant Paul M. Cowan, as the curator of the estate of Jose Manuel Gonzalez Testino ("Testino")[1] pursuant to Rule 55 of the Federal Rules of Civil Procedure ("FRCP").   Plaintiff's motion ("Motion") is based on documents obtained through discovery from various individuals affiliated with PLS and Testino, deposition testimony, a signed declaration ██████████████████████████████, a signed declaration from a former CITGO employee, an expert report, the pleadings and documents filed in this action, filings in the criminal cases against Testino and CITGO employees bribed by Testino and his affiliates, and such additional arguments and evidence that may be presented at or before any hearing that the Court may order.[2]

---

[1] On March 1, 2023, Testino fatally shot his 3-year-old son and then himself.  Peter D'Oench, *Father Kills Self, 3-Year-Old Son in Coconut Grove High-Rise Condo Building, Police Say*, CBS News (Mar. 2, 2023, 9:09 PM), https://www.cbsnews.com/miami/news/2-found-dead-at-coconut-grove-condo-police-say/.   The shooting took place in a condominium in Miami where Testino had been living.  *See id.*  Testino had been scheduled to be sentenced on March 22, 2023, in connection with his guilty plea of bribing CITGO employees.  Notice of Resetting, *United States v. Jose Manuel Gonzalez-Testino*, No. 19-cr-00341 (S.D. Tex. Jan. 23, 2023), Ex. 18.  On November 9, 2023, this Court ordered that Paul M. Cowan, as the curator of Testino's estate, be substituted as a named party in place of Testino.  (ECF No. 48.)  Given that the violations of law described in this Motion were committed by PLS and Testino, and given that Cowan, as the curator of Testino's estate, is simply a party in that capacity, this Motion will refer to PLS and Testino as "Defendants."  CITGO respectfully moves that the judgment requested in this Motion be entered against the current defendants to this lawsuit, namely, PLS and Paul M. Cowan, as the curator of Testino's estate.

[2] As discussed in greater detail in CITGO's Motion to Exceed the Page Limit, ECF No. 51, evidentiary hearings are generally held when unliquidated damages are sought.  *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993).  However, unliquidated damages can be awarded without a hearing where the amount of damages can be calculated with reasonable certainty

## INTRODUCTION

CITGO is one of the largest domestic refiners, transporters, and marketers of motor fuels, lubricants, petrochemicals and other industrial products.  It employs over 3,000 individuals, owns and operates three highly sophisticated crude oil refineries, and wholly or jointly owns 38 active terminals for the storage and transportation of fuel and other industrial products.  The Company markets motor fuels to thousands of independently-owned and branded retail outlets, and directly markets jet fuels and lubricants to industrial customers.  It is indirectly owned by Petróleos de Venezuela, S.A. ("PDVSA"), the state-owned oil company of the Bolivarian Republic of Venezuela.

Historically, at PDVSA's instruction, CITGO arranged for third-party logistics vendors to provide procurement and logistics services to facilitate the sale and transportation of equipment, goods and/or materials to PDVSA, a process that CITGO referred to as Shareholder Procurement.  It was through this work that PLS and Testino engaged in a massive bribery scheme to defraud CITGO.  Testino was a dual U.S.-

---

by referring to the pleadings and supporting documents.  *Id.*; *see also Gross v. RSJ Int'l, LLC*, No. 11-cv-73, 2012 WL 729955, at *4 (E.D. La. Mar. 6, 2012) (finding breach of contract damages proven with reasonable certainty by affidavits, a budget, and receipts).  Based on the evidence provided herein, CITGO respectfully submits that no hearing is required, and that the Court may enter judgment based on the evidence presented in (and attached to) this Motion.  However, to the extent the Court disagrees with that conclusion, CITGO respectfully submits, in the interests of judicial economy, that this Court should award damages on those issues for which it finds sufficient support herein, and order an evidentiary hearing limited to the remaining damages issues.  *Cf. Edge Adhesives Inc. v. Sharpe Concepts, LLC*, No. 4:15-cv-405-O, 2015 WL 12743618, at *2, 5–6 (N.D. Tex. Aug. 31, 2015) (awarding $60,000 in damages without an evidentiary hearing and granting the plaintiff leave to refile to "more specifically prove its damages" on additional claims).

Venezuelan citizen and businessman who owned and controlled a number of U.S. and non-U.S. companies that purportedly provided goods and services related to the oil industry. Among the many companies he directed and controlled was PLS, a Panamanian company that claimed to be in the business of managing international purchases through a specialized procurement and logistics team. PLS materially misled CITGO about its experience and operations, and, based on those misrepresentations, CITGO awarded PLS contracts with CITGO to provide logistics services. Specifically, PLS took title to certain goods, and then arranged delivery of those goods to Venezuela.

In providing these so-called "logistics" services, PLS and Testino defrauded CITGO in three principal ways. First, PLS and Testino arranged for CITGO to purchase the relevant goods from separate entities owned and controlled by Testino, and those entities charged prices that vastly exceeded the market value of the goods. Second, PLS charged a percentage fee for its services that was 5.75% of the cost of the goods it transported. That percentage was well above the fair market value and was made even more exorbitant because it was applied to the inflated prices charged by Testino-controlled vendors. Third, PLS repeatedly abused its contractual right to reimbursement from CITGO for certain types of expenses by substantially inflating the costs of these expenses.

To advance and conceal their scheme, PLS and Testino paid millions of dollars in bribes to a small handful of CITGO employees responsible for Shareholder Procurement. These bribes caused the recipients to act against their fiduciary duties to CITGO in overlooking, approving, and in some cases facilitating PLS and Testino's conduct. Eventually, the conduct was discovered as part of a multi-year criminal investigation by

the United States Department of Justice, and Testino and two CITGO employees pleaded guilty to violations of the Foreign Corrupt Practices Act ("FCPA"), money laundering, and/or other charges.  Ultimately, this scheme, which operated from approximately 2012 to 2018, caused massive economic and reputational damage to CITGO.  As discussed below, PLS and Testino's fraud and bribery scheme caused CITGO to suffer at least $84.8 million in economic damages.

On May 26, 2020, CITGO initiated this lawsuit to recover those damages.  CITGO alleged multiple breaches of contract by PLS, fraud, and civil claims related to the Racketeer Influenced and Corrupt Organization Act ("RICO").  Neither PLS nor Testino appeared in the lawsuit, despite being properly served.  The Court Clerk entered a default against both Defendants on January 22, 2021.

Because neither Defendant appeared in this matter, CITGO was initially unable to obtain discovery in an effort to help quantify the scope and breadth of the conspiracy. Instead, at great expense over many months, CITGO pursued discovery from a number of third parties.  Upon the basis of that discovery, deposition testimony from third parties, two signed declarations from third parties, and analysis from an expert witness, CITGO can now establish that it suffered damages of at least $84.8 million.  Through this Motion, CITGO seeks those damages, which are mandatorily trebled under RICO to approximately $254.4 million.  A default judgment granting CITGO that relief is appropriate given Defendants' default,[3] that CITGO sufficiently pleaded each element of each of its causes

---

[3] Cowan, as the curator of Testino's estate who has been substituted in as a party, simply "steps into the same position" as Testino, with the lawsuit continuing as it was at the time

of action, and that CITGO can establish with "reasonable certainty" the amount of damages it is owed, as described in detail in this Motion.[4]

## I.   Factual Background: PLS And Testino's Scheme To Defraud CITGO

On March 5, 2014, CITGO entered into a Service Contract Agreement with PLS (the "Agreement"), pursuant to which PLS would provide procurement and logistics services in order to facilitate the sale and transportation of equipment, goods and/or materials to PDVSA.  Complaint, (ECF No. 1) ("Compl.") ¶¶ 2, 28.  In exchange for these services, the Agreement provided that PLS would receive 5.75% of the purchase price of the goods, as well as any expenses PLS incurred (*i.e.*, paying for shipping the goods), for any transaction for which it was selected as the logistics provider.  *Id*. ¶ 4.

That Agreement was obtained by PLS as part of a massive and sprawling bribery scheme operated by PLS and its beneficial owner, Testino, in which Defendants defrauded CITGO from the outset, including by paying millions of dollars in bribes to secure the Agreement and have PLS selected as CITGO's logistics vendor for numerous, highly lucrative transactions.  *Id*. ¶¶ 12–13, 68–74; *see also* Information, *United States v. Jose M. Gonzalez-Testino*, No. 4:19-cr-00341 (S.D. Tex. May 14, 2019), Ex. 3 ¶ 22 (the

---

of Testino's death.  *See Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971).  Thus, because Testino was in default prior to his death, Cowan is in default.

[4] *See Plumbers & Steamfitters Loc. 106 Health & Welfare Fund v. Ace Plumbing & Heating, Inc.*, No. 2:09 CV 1940, 2011 WL 1831750, at *2–3 (W.D. La. May 11, 2011) ("Once default has been entered, the plaintiff's well-pleaded factual allegations are deemed admitted . . . ."  The Court must additionally "ascertain the amount of damages with reasonable certainty.").

information, to which Testino pleaded guilty and which was incorporated by reference in the Complaint (Compl. ¶¶ 8, 36–39), states that Testino "paid bribes to PDVSA officials,"[5] in order to help his companies "win PDVSA contracts to supply equipment and services, *including logistics services*") (emphasis added); Minute Entry for guilty plea of Testino, *United States v. Jose M. Gonzalez-Testino*, No. 4:19-cr-00341 (S.D. Tex. May 29, 2019), Dkt. 48 ("Minute Entry for Testino Guilty Plea") (admitting to all counts of the information); Plea Agreement of Jose Luis De Jongh-Atencio ("De Jongh"), *United States v. Jose Luis De Jongh-Atencio*, No. 4:20-cr-00305 (S.D. Tex. Mar. 22, 2021), Ex. 4 at 12 (De Jongh admitted to "taking steps to ensure that one of [Testino's] companies was selected by Citgo for a contract to provide Citgo with logistics services to obtain goods and ship them to Venezuela"); Ex. 17 (the Declaration of Laymar Giosse Pena Torrealba ("Pena"), a former CITGO Shareholder Procurement employee, in which she says she "accepted bribes from Johana Haddad who worked on behalf of Testino and Petroleum Logistics Service Corp. . . . [i]n exchange for . . . among other things, help[ing] PLS . . . obtain business from CITGO").

Through this wide-ranging conspiracy, PLS and Testino arranged for PLS to charge CITGO grossly inflated commissions for logistics services.  Compl. ¶¶ 12–13, 16, 41, 56; *see also* Superseding Indictment, *United States v. Jose Luis De Jongh-Atencio*, No. 4:20-cr-00305 (S.D. Tex. Dec. 16, 2020), Ex. 5 ¶¶ 10, 57–58(c) (superseding indictment of De Jongh, which states that, in exchange for bribes, De Jongh assisted PLS, identified as

---

[5] In the information, PDVSA is defined to include CITGO.  Ex. 3 ¶ 2.

"Company A," by "providing business advantages that allowed Company A to procure a more favorable contract with Citgo than other logistics vendors that contracted with Citgo").[6]   PLS and Testino also utilized the bribery scheme to arrange for Testino-controlled entities to be selected as the equipment suppliers for various high-dollar transactions with CITGO, whereby those Testino-controlled entities charged prices greatly exceeding fair market value.   Compl. ¶¶ 12–13, 16, 41, 56.   This meant that for many purchases of equipment from a third-party vendor, CITGO was defrauded into (1) paying PLS grossly inflated commissions for logistics services on the purchase; and (2) paying the third-party vendor that was secretly controlled by Testino grossly inflated prices for the product being purchased.   *Id*.   The details regarding this scheme, and the injuries it caused to CITGO, are laid out below.

### A.   PLS, Testino, And Their Agents Devised A Bribery And Bid-Rigging Scheme To Defraud CITGO

CITGO arranged for logistics vendors to provide procurement and logistics services to facilitate the purchase of equipment, goods, and/or materials and to transport such items to PDVSA.   *Id*. ¶¶ 30–31.   CITGO referred to this project as Shareholder Procurement, and the CITGO employees responsible for it were called the Shareholder Procurement Department or Special Projects Group.   *Id*. ¶ 30.   For a particular transaction, a Special Projects Group employee would select a vendor from which to purchase particular goods, as well as the logistics vendor that would transport those goods from the equipment vendor

---

[6] This information is from Count One of the Superseding Indictment.   As part of his plea agreement, De Jongh pleaded guilty to Count One.   Ex. 4 at 1.

to PDVSA.  *Id.* ¶¶ 29–31; *see also* Ex. 6 ¶¶ 9–10 (Declaration of ████████████

████████████████████████████).  Around 2012, Testino, PLS, and other

co-conspirators devised a bribery and bid-rigging scheme to defraud CITGO by illicitly

obtaining a logistics contract for the Shareholder Procurement project along with purchase

orders for equipment from Testino-controlled entities.  Compl. ¶ 61.  Testino and his co-

conspirators put this plan in motion in or about December 2012 when they created PLS,

and specifically its logistics group, for the purpose of fraudulently obtaining a logistics

vendor contract with CITGO.  *See id.*; Ex. 7 at 201–02.  They also created a web of shell

companies to obtain purchase orders for equipment from the Special Projects Group.  *See*

Compl. ¶ 73; Ex. 6 ¶ 10.  None of these companies manufactured the ordered equipment;

they were simply middlemen between CITGO and the original equipment manufacturer

("OEM").  *See* Ex. 6 ¶ 10.  PLS and these shell companies were controlled by Testino and

his co-conspirators and shared finances, personnel, and other resources.  *See* Compl. ¶ 73;

Ex. 7 at 68–69.

In order to be selected in the first instance as a logistics vendor by CITGO, PLS

provided materially false information to the Company designed to deceive the Company

about PLS's experience and operations.  For example, around 2013, PLS sent CITGO an

introductory letter, which stated that PLS was "part of a . . . conglomerate[] with over 10

years of commercial operations in the oil and gas business," which had (1) "assets,

partnerships and distributors" in numerous countries and an active customer base,

including Petrobras and several other major oil companies. Ex. 7 at 180; Ex. 8.  None of

these statements was true.  At that time, PLS had just been formed, and had virtually no

assets, partnerships, or distributors to speak of, but nonetheless provided this false information to CITGO to obtain business. Ex. 7 at 156–58, 179–81.[7]

To conceal these lies, and to fraudulently induce CITGO to enter into the Agreement, PLS and Testino bribed certain CITGO employees, including by making cash payments and by providing free or below-market-rate gifts, such as watches, jewelry, a cellphone, and stays at private residences. Compl. ¶¶ 39–41; Ex. 7 at 116–17; Ex. 3 ¶ 23 (information to which Testino pleaded, which states Testino and his co-conspirators provided to certain CITGO employees "private jet travel, recreational travel including plane tickets and hotel accommodations, Super Bowl and other sports tickets, meals, entertainment, and luxury consumer goods including jewelry and watches"). One of the bribe recipients was, for a period of time, the manager of CITGO's Special Projects Group, De Jongh, who helped PLS obtain the Agreement with CITGO. Ex. 4 at 12. As part of his plea admitting to conspiring to launder bribe proceeds received from Testino, De Jongh admitted to receiving over $3 million in bribes from Testino and associates in addition to tickets to a World Series game, tickets to the Super Bowl, and tickets to a U2 concert that he admitted were given to him to facilitate, among other things, CITGO entering into the Agreement and the Shareholder Procurement Group awarding Testino-controlled entities purchase orders. *Id.* at 12, 14–15.

---

[7] Portions of this exhibit unrelated to supporting the citation are redacted.

**B.** **PLS And Testino Contractually Agreed To Follow All Laws, Not Pay Bribes Or Provide Gifts, And To Disclose Any Related Parties**

In March 2014, following bribes paid to De Jongh and others, CITGO and PLS entered into the Agreement.  Compl. ¶¶ 2–3, 5, 12; Ex. 9 (the Agreement, which was incorporated by reference into the Complaint (*see, e.g.*, Compl. ¶¶ 2–3, 24, 28–29, 31, 44–47, 49, 52, 58–59) and subsequent change orders amending the Agreement).  The Agreement described the processes that CITGO and PLS were bound to follow in the event that CITGO chose to use PLS as its logistics vendor for a certain procurement of goods requested by PDVSA.  Compl. ¶¶ 2, 29; Ex. 9 ¶¶ 2, 4.  Specifically, if CITGO chose PLS as its logistics vendor, PLS was to buy the underlying goods from the third-party vendor specified by CITGO and facilitate the goods' transport to CITGO's ultimate parent corporation, PDVSA.  Compl. ¶¶ 2, 28–30; Ex. 9 ¶ 2.  PLS was compensated for this work through a commission of 5.75% of the purchase price of the goods, equipment, or material it purchased for CITGO, as well as reimbursement of any expenses and/or costs, including costs from PLS subcontractors handling shipping and transportation services.  Compl. ¶ 4; Ex. 9 ¶¶ 4–5.  Notably, the Agreement did not provide for any cap on the 5.75% commission, no matter the price or quantity of the goods that PLS bought for CITGO.  Compl. ¶ 4; Ex. 9 ¶ 4.  The 5.75% rate was about twice the roughly 1–3% commission that typical vendors hired for procurement logistics work received.  Ex. 6 ¶ 15; Ex. 10 ¶¶ 57–62.

PLS breached numerous representations in the Agreement, including following applicable laws, refraining from making payments or providing gifts to CITGO employees,

and disclosing any common ownership between PLS and equipment or other vendors. Compl. ¶¶ 43–57.

In Section 7(e) of the Agreement, for example, PLS represented that it would "provide the Services in full compliance with all applicable national, regional and local laws, rules, regulations, ordinances, orders, decisions and decrees of any governmental authority, whether now or hereinafter in effect." *Id*. ¶¶ 43–44; Ex. 9 ¶ 7(e).  In Section 19(a), PLS represented that it would "comply with all applicable laws, rules and regulations issued by applicable governmental authorities."  Compl. ¶ 45; Ex. 9 ¶ 19(a).  PLS also agreed in Section 23 that it would, "in the performance of this Agreement, comply with all applicable laws and regulations."  Compl. ¶ 46; Ex. 9 ¶ 23.  PLS acknowledged its awareness of the FCPA in Section 19(b), which stated that [PLS] "acknowledges that it is familiar with the U.S. Foreign Corrupt Practices Act . . . and its prohibitions regarding the payment of [sic] giving of anything of value, either directly or indirectly, to an official of a foreign government . . . to obtain or retain business involving the products."  Compl. ¶¶ 47–48; Ex. 9 ¶ 19(b).

In Section 18 of the Agreement, PLS represented that neither it nor "anyone acting on [its] behalf will directly or indirectly pay (a) any salaries, commissions or fees of any kind, or (b) dispense favors, gifts or entertainment of greater than token or nominal value to the other party employees or any members of their families."  Compl. ¶ 49; Ex. 9 ¶ 18.

PLS also represented in Section 18 that it would "immediately disclose to CITGO any common ownership between [PLS] and any vendor or service provider through which [PLS] performs the Services."  Compl. ¶¶ 3, 52; Ex. 9 ¶ 18.

- 11 -

PLS breached all of these provisions as described in more detail, *infra* Section V.A.3.

### C.   After Executing The Agreement, PLS And Testino Continued To Bribe CITGO Officials To Obtain Business For PLS And Testino-Controlled Companies

Securing the Agreement was only the first step in PLS and Testino's bribery scheme. Under the structure of the Agreement, CITGO was not obligated to use PLS as a logistics vendor in any transaction.  Compl. ¶ 41; Ex. 9 ¶¶ 4, 18.  Therefore, in order to secure inflated commissions for PLS and to convince CITGO to purchase equipment from Testino-controlled entities, PLS and Testino continued bribing certain CITGO employees. Compl. ¶ 41.  PLS and Testino focused on bribing CITGO employees in the Special Projects Group who were responsible for choosing the logistics vendor to service a particular purchase, as well as the vendor from which the goods, materials, or equipment would be supplied.  *Id.* ¶¶ 30, 41; *see also* Plea Agreement, *United States v. Laymar Giosse Pena Torrealba*, No. 4:19-cr-00186 (S.D. Tex. Mar. 22, 2019), Ex. 11 at 11 (former member of CITGO's Special Projects Group, who admitted to accepting bribes from Testino and his associates); Ex. 4 at 11–12 (plea agreement of De Jongh, a former member of CITGO's Special Projects Group, who admitted to accepting bribes from Testino and his associates). PLS, Testino, and their agents and co-conspirators paid bribes in exchange for inside information about upcoming CITGO purchases, for selecting PLS as logistics vendor, and for selecting a Testino-controlled entity as the vendor of the goods being purchased. Compl. ¶¶ 39, 43, 51, 61, 72; Ex. 3 ¶ 22; Ex. 4 at 12–13; Ex. 6 ¶¶ 9, 13; Ex. 11 at 11–12.

The bribe payments were often calculated as a percentage of the value of the purchase order awarded to the Testino-controlled entity, and could range from 0.1% to 5%. Ex. 6 ¶ 13; Ex. 12.  Testino, PLS, and their associates tracked these bribe payments to CITGO employees on spreadsheets, an example of which is attached to this Motion as Exhibit 12.  *See also* Preliminary Examination / Detention Hearing, *United States v. Jose Manuel Gonzalez-Testino*, No. 4:19-cr-00341 (S.D. Tex. Oct. 1, 2018), Ex. 13 at 21–23 (testimony of Special Agent Corbin Wickman, Department of Homeland Security, in which he stated that a Testino associate tracked in a spreadsheet the bribe payments made to CITGO employees in exchange for PLS purchase orders); Ex. 14 (email to Testino discussing an outstanding bribe payment to a CITGO employee code named "Carmen," originally in Spanish and translated to English); Ex. 17 ¶ 6 (describing Ex. 12 as a spreadsheet documenting specific purchase orders awarded to PLS and corresponding bribes paid to individuals working for CITGO).

This spreadsheet shows, in column B, the initials of specific CITGO employees in the Special Projects Group.  Ex. 12.  Each row relates to a specific transaction with CITGO, with the numbers in column D referring to specific purchase orders for which CITGO used PLS as its procurement and logistics vendor.  *Id.*; *see also* Ex. 17 ¶ 6.  Columns G, I, K, M, N, and O list code names for these employees, and for each row (transaction) the bribe amount received by that employee is listed.  Ex. 12.  For example, Defendants paid $95,581.23 to a CITGO employee code named "Carmen," $9,558.12 to a CITGO employee code named "Yleana Garcia," and $19,116.25 to a CITGO employee code named "Walter" to secure purchase order 160401 for PLS.  *Id.*

Such bribes were necessary to win business because, without them, CITGO never would have selected any of Testino's companies for the relevant work. Testino's companies were effectively shell companies without the requisite experience or assets to be able to supply the often specialized goods, materials, and/or equipment being purchased. For example, despite being engaged to provide logistics and transportation services, PLS never provided such services directly, but instead sub-contracted all of that work, charged that sub-contracted work to CITGO as reimbursable expenses, and still retained its sizeable (and unjustified) commission. *See* Ex. 6 ¶ 15; Ex. 15 at 21–22, 152–53 (stating that Petroleum Logistics Service USA, Inc. ("PLS USA"), a PLS subsidiary, simply provided "PO management" services and that the warehousing and transportation of the goods was subcontracted to other entities that were, unbeknownst to CITGO, related to PLS USA). Similarly, the Testino-controlled companies that sold equipment and goods to CITGO were shell companies Testino and his associates centrally operated without disclosing that fact to CITGO. Ex. 7 at 68–70; Ex. 6 ¶¶ 9, 10, 16, 17, 20, 21. These shell companies would ostensibly submit bids to CITGO indicating that the companies were the sources of the goods, materials, and equipment for CITGO shareholder procurements. Ex. 6 ¶ 10. In actuality, Testino would buy the goods from the cheapest producer in the market (often sourcing the goods from low quality producers) and then have the shell company apply a substantial and unjustified markup. *Id.* ¶¶ 11–12. Conservatively, these markups averaged more than 67% of the cost of the goods and, at times, could reach four to five times the cost of the goods. *Id.*; Ex. 10 ¶¶ 50–51.

- 14 -

PLS and Testino concealed their misconduct by giving the shell companies names that were strikingly similar to real manufacturers of the relevant products. For instance, Stang Industrial Products was a Testino entity, and its doppelgänger, Stang Industries, Inc., was a real manufacturer of industrial products unrelated to Testino. Ex. 6 ¶ 6; Ex. 10 ¶ 36. The connections between PLS, Testino, and the various entities controlled by Testino and his co-conspirators were *never* disclosed to CITGO. Compl. ¶ 15. Testino and his co-conspirators also hid their connections to these companies by incorporating many of them in Panama, where ownership is easily disguised, and by having family members serve as officers and/or owners or the company. *See* Ex. 6 ¶ 20. In particular, Testino often had his father, who had a different yet very similar name (Jose Manuel Gonzalez), serve as the listed owner and an officer of companies to confuse anyone conducting due diligence on an entity. *Id.* ¶¶ 20, 22.

**D.     PLS And Testino's Bribery And Self-Dealing Cost CITGO Over $84.8 Million**

In total, PLS and Testino paid millions of dollars in bribes and gifts to CITGO employees to carry out their scheme. Compl. ¶ 72; *see also* Ex. 12; Ex. 6 ¶¶ 13, 18. This bribery and self-dealing scheme was incredibly lucrative for PLS and Testino, and damaging to CITGO, as it allowed PLS and Testino to charge CITGO huge and unjustifiable markups on the goods purchased from Testino-controlled entities and the logistics services provided by PLS. In total, Testino's and PLS's bribery allowed PLS to serve as the logistics vendor for at least 21 procurement projects, 11 of which included

transactions with an equipment vendor controlled by Testino.[8]    Ex. 10 ¶¶ 39–40,
Schedule C.  CITGO overpaid on the procurements arranged by PLS and Testino by at least
$72,461,343.00, consisting of the estimated 67.4% markup the Testino-controlled vendors
charged for the purchased goods.  *Id*.  ¶¶ 50–54.  This is likely a very conservative estimate,
as ███████████████████████ estimated that Testino profited by approximately $400
million from transactions with CITGO, including the inflated procurements for which PLS
served as logistics vendor.  Ex. 6 ¶ 18.

Moreover, the 5.75% rate that PLS received for the 21 procurement projects was
substantially above the maximum market rate of 3% for such services.  Ex. 10 ¶¶ 56–63.
The commission PLS then received on the transactions with Testino-controlled entities as
part of these projects was inflated further by the markup that Testino charged through the
self-dealing scheme.  For instance, if a Testino-controlled entity applied a 91% markup to
the costs of goods that CITGO was buying, the 5.75% commission was also inflated by
91%.  In total, CITGO was defrauded into paying PLS at least $8,562,945.43 in above-
market rate procurement commissions.  *Id.* ¶¶ 63–67.

---

[8] CITGO has identified entities controlled by Testino through deposition testimony,
declarations, and documents produced to CITGO through third-party discovery.  In
addition, CITGO conducted public records research to identify entities owned by Testino.
However, given the extensive efforts Testino and his associates undertook to hide Testino's
affiliation with his various companies and given PLS and Testino's refusal to participate
in this lawsuit (and hence discovery), it is possible—indeed, likely—that CITGO has not
been able to identify every entity controlled by Testino, and that the number of transactions
CITGO unwittingly engaged in with Testino entities may be much higher.

Lastly, under the Agreement, PLS could charge insurance, freight, duties, taxes, and other similar costs to CITGO related to the logistics services PLS was to provide.  Compl. ¶ 4; Ex. 9 ¶¶ 3(b), 5, and at Exhibit A.  PLS improperly inflated these costs as well.  Compl. ¶¶ 4, 16, 56; Ex. 16.  Totaling these amounts up, CITGO was defrauded out of at least an additional $3,783,052.54.

All told, this amounts to at least $84,807,340.97 in inflated and unjustified costs that Defendants fraudulently induced CITGO to pay.[9]

## II.   **Procedural History**

On March 21, 2019, Pena, a former CITGO Special Projects Group employee, pleaded guilty to conspiracy to commit money laundering in connection with her acceptance of bribes from Testino and his associates.  Minute Entry, *United States v. Laymar Giosse Pena Torrealba*, No. 19-cr-00186 (S.D. Tex. Mar. 21, 2019), Dkt. 8.  Shortly thereafter, on May 29, 2019, Testino pleaded guilty to one count each of conspiracy to violate the FCPA, violation of the anti-bribery provisions of the FCPA, and failure to file a foreign bank account report.  Minute Entry for Testino Guilty Plea.  About a year later, on May 26, 2020, CITGO filed its Complaint against Defendants for breach of contract, fraud, indemnification, and civil RICO claims.  (ECF No. 1.)

---

[9] In addition to the inflated costs, CITGO also incurred substantial attorneys' fees and related costs associated with investigating and remediating these matters and bringing this action.  Compl. ¶¶ 17–18, 58–59.  In Section 19(e) of the Agreement, PLS promised that "[i]n the event that either party breaches any provision of this Agreement or Addendum related hereto, the breaching party agrees to indemnify, defend and hold harmless the other party from any . . . cost incurred by the non-breaching party."  *Id.* ¶ 58.  Nonetheless, CITGO has elected not to pursue those fees and costs at this time.

On August 21, 2020, CITGO filed proof of service of the Complaint on PLS.  (ECF No. 21.)  On October 7, 2020, CITGO filed proof of service of the Complaint on Testino. (ECF No. 25.)  As neither PLS nor Testino answered the Complaint or otherwise appeared in this action, (*see* ECF No. 29-1, Robert J. Meyer Decl. ¶¶ 15, 22), CITGO filed its request for entry of default with the Court on December 16, 2020, (ECF No. 29.).  On January 22, 2021, the Clerk entered default against Defendants pursuant to FRCP 55.  (ECF No. 31.)

As discussed in CITGO's March 2, 2021 status update to the Court, (ECF No. 32), CITGO engaged an expert in accounting and economic damages to review the available evidence, including invoices and other documents and testimony related to Defendants' dealings with CITGO, and to opine on the amount of damages CITGO suffered as a result of Defendants' bribery scheme.  Shortly after this update, on March 22, 2021, former CITGO Special Projects Group manager De Jongh pleaded guilty to conspiracy to launder money in connection with his receipt of bribes from Testino and Testino's associates. Minute Entry, *United States v. Jose Luis De Jongh-Atencio*, No. 20-cr-00305 (S.D. Tex. Mar. 22, 2021), Dkt. 90.

On August 25, 2021, CITGO filed a motion seeking discovery against nine third parties believed to have relevant information regarding the bribery scheme and, in particular, the amount of damages caused by PLS and Testino's conduct.  (ECF No. 33.) On October 13, 2021, the Court granted CITGO's motion, and CITGO promptly began to undertake this discovery.  (ECF No. 36.)  CITGO sought documents and a deposition from Pena, PLS USA (a subsidiary of PLS), and the former President of PLS (Ruben Dario Gonzalez-Castillo ("Ruben Gonzalez")), and documents from two former officers of PLS

USA, two associates of Testino, PLS USA's bank, and a warehouse and logistics company with which PLS and PLS USA subcontracted. Obtaining discovery from most of the third parties proved difficult, involving extensive meet-and-confers with almost all of the third parties, and litigation to enforce subpoenas against five of the third parties in three different federal district courts. The litigation against three of these parties was particularly protracted.[10]

CITGO ultimately obtained tens of thousands of documents, and took three depositions. Based upon that discovery and documents already in CITGO's possession, an expert witness drafted a report containing an opinion as to CITGO's damages in this case, attached hereto as Exhibit 10.

---

[10] CITGO filed motions to compel Javier Aurrecoechea and Sergio Omana, both former PLS USA employees, to comply with subpoenas on January 3, 2022, and April 25, 2022, respectively, and a motion to compel PLS USA to comply with a subpoena on March 14, 2022. Petitioner CITGO Petroleum Corp.'s Motion to Compel Respondent Aurrecoechea's Compliance with Subpoena, *CITGO Petroleum Corp. v. Javier Aurrecoechea*, No. 1:22-mc-20024-JLK (S.D. Fla. Jan. 3, 2022), Dkt. 1; ECF No. 39 (motion to compel Omana); Petitioner CITGO Petroleum Corp.'s Motion to Compel Petroleum Logistics Service USA, Inc.'s Compliance with Subpoena, *CITGO Petroleum Corp. v. Petroleum Logistics Service USA, Inc.*, No. 1:22-mc-20762-RKA (S.D. Fla. Mar. 14, 2022), Dkt. 1. After additional litigation, including, upon a motion by CITGO, an order from the District Court for the Southern District of Florida compelling PLS USA to identify a corporate representative for a deposition, Aurrecoechea and Omana finally sat for depositions as representatives of PLS USA on February 28 and March 1, 2023, respectively. Order on Petitioner's Motion for Contempt, Third Party Forensic Examination, and Designation of a Corporate Representative for Deposition and Respondent's *Nunc Pro Tunc* Motion for Extension of Time, *CITGO Petroleum Corp. v. Petroleum Logistics Service USA, Inc.*, No. 1:22-mc-20762-RKA (S.D. Fla. Jan. 18, 2023), Dkt. 43; Ex. 15 (excerpts from Aurrecoechea's deposition).

On March 1, 2023, Testino killed one of his children and took his own life in a tragic incident in Miami, Florida.[11]  On October 13, 2023, CITGO moved to substitute Cowan, the curator of Testino's estate, as a party in place of Testino.  (ECF No. 44.)  On November 9, 2023, the Court granted CITGO's motion.  (ECF No. 48.)

CITGO now brings this Motion seeking a Final Judgment finding PLS and Cowan, as the curator of Testino's estate, liable for CITGO's claims and awarding appropriate damages.

## ARGUMENT

The Court should grant CITGO's motion for default judgment, enter judgment against PLS, and award CITGO $84,807,340.97 in compensatory damages, which, under RICO, should be trebled to $254,422,022.91, plus pre- and post-judgment interest.  As described below in Section III, because there has been a default by Defendants and the Court Clerk has entered it, what remains is for Plaintiff to demonstrate under the *Lindsey* factors that entry of a default judgment is appropriate, and that such a judgment would not be unfair or unduly harsh.  As discussed below in Section IV, all of the factors weigh in favor of granting CITGO's motion for default judgment.

---

[11] *Police: Venezuelan Businessman Killed Son, Self in Miami*, AP News (Mar. 3, 2023, 12:44 PM),   https://apnews.com/article/venezuelan-businessman-boy-killed-bribery-9a78f7a3b3638c5e4f80836c3dceec66; Peter D'Oench, *Father Kills Self, 3-Year-Old Son in Coconut Grove High-Rise Condo Building, Police Say*, CBS News (Mar. 2, 2023, 9:09 PM),   https://www.cbsnews.com/miami/news/2-found-dead-at-coconut-grove-condo-police-say/.

On a motion for a default judgment, this Court is required to determine whether the Complaint contains sufficient factual bases to establish each of CITGO's claims. In doing so, this Court is required to assume the veracity of every fact pleaded in the Complaint. On that basis, the Court must determine if each element of Plaintiff's claims has been pleaded. As detailed below in Section V, CITGO has adequately pleaded all of its claims. In Section V.A, CITGO establishes that PLS breached the Agreement with CITGO by (1) bribing CITGO employees to award purchase orders to PLS, thereby failing to comply with applicable laws as required by the Agreement, (2) providing payments and gifts to CITGO employees in contravention of the Agreement, and (3) failing to disclose, as required by the Agreement, that PLS and several of the entities CITGO procured goods from were related. CITGO has also adequately alleged that PLS fraudulently induced CITGO to enter into the Agreement by misrepresenting that PLS would comply with the law (Section V.B) and PLS and Testino's bribery scheme violated RICO (Section V.C).

This Court must also evaluate the damages suffered by CITGO resulting from the scheme engineered by PLS and Testino. As described in Section VI.A, CITGO is entitled to compensatory damages from PLS and Testino of $84.8 million. These damages consist of the inflated prices (*i.e.*, above fair market value) CITGO paid for (1) the goods and services PLS purchased from PLS- and Testino-affiliated entities ($72.5 million); (2) PLS's commission for its services ($8.6 million); and (3) the delivery expenses incurred by PLS but billed to CITGO ($3.8 million). Under RICO's mandatory trebling provision, CITGO should be awarded $254.4 million in damages plus prejudgment interest. CITGO is also entitled to post-judgment interest on the entire judgment (Section VI.B).

### III.   The Required Steps Prior To A Default Judgment Have Been Completed

Obtaining a default judgment is a three-step process, the first two steps of which have been completed here.  First, there must be a default caused by the defendant's failure to respond to the complaint.  *See N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996); *see also Produce Pay, Inc. v. Fresh Organic Vegetable, Inc.*, No. 7:21-CV-00402, 2022 WL 1321044, at *2 (S.D. Tex. May 3, 2022).  Second, the Clerk must enter default against the defendant.  *Produce Pay, Inc.*, 2022 WL 1321044, at *2.  Only then can the Court consider whether default judgment is appropriate.  *Id.*

Both Defendants failed to respond to the complaint within the timeframe required by FRCP 12.  *See* Request for Entry of Default Against Jose Manuel Gonzalez Testino and Petroleum Logistics Service Corp.  (ECF No. 29.)  The Clerk therefore entered default against both Defendants on January 22, 2021.  (ECF No. 31.)

### IV.   The *Lindsey* Factors Weigh In Favor Of Entering A Default Judgment

Given Defendants' failure to respond and the Clerk's entry of default, the question whether to enter a default judgment is ripe.  In the Fifth Circuit, whether a court should enter a default judgment turns on two determinations: (1) as a preliminary matter, whether default judgment is appropriate under the *Lindsey* factors; and (2) if it is, whether the plaintiff's complaint establishes all the elements of the plaintiff's claims.  *See, e.g.*, *Ins. Co. of the W. v. H & G Contractors, Inc.*, No. C-10-390, 2011 WL 4738197, at *2–3 (S.D. Tex. Oct. 5, 2011).  The *Lindsey* factors are:

> [1] whether material issues of fact are at issue, [2] whether there has been substantial prejudice, [3] whether the grounds for default are clearly established, [4] whether the default was

> caused by a good faith mistake or excusable neglect, [5] the harshness of a default judgment, and [6] whether the court would think itself obliged to set aside the default on the defendant's motion.

*See Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

Each of the six *Lindsey* factors weighs in favor of a default judgment against Defendants here.   First, no material issues of fact exist because neither Defendant responded to the Complaint, which contains ample well-pleaded factual allegations that must at this stage be credited as true.  *Ins. Co. of the W.*, 2011 WL 4738197, at *3; *Deutsche Bank Nat'l Tr. Co.*, No. EP-17-CV-237-PRM, 2018 WL 6184806, at *4 (W.D. Tex. Aug. 8, 2018).

Second, there is no prejudice to Defendants because, by their failure to contest any of the allegations, they admit the allegations.  *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 6184806, at *4.  Indeed, Defendants' failure to appear "threatens to bring the adversary process to a halt, effectively prejudicing [the] Plaintiff's interests."  *Ins. Co. of the W.*, 2011 WL 4738197, at *3.

Third, "Plaintiff's timely service, reasonable prayer for relief, and Defendants' failure to appear establish clear grounds for default judgment."  *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 6184806, at *5.  This is especially so where Plaintiff first effected service on Defendants over three years ago.  (ECF No. 21) (August 21, 2020 proof of service on PLS); (ECF No. 25) (October 7, 2020 proof of service on Testino).  There is also no dispute, as laid out below, that PLS and Testino had notice of these proceedings, and other related proceedings, and made the voluntary decision not to appear to contest the claims.

- 23 -

Fourth, Defendants have not claimed to have made a good faith mistake or excusable neglect, and there is no evidence indicating such a mistake or excusable neglect. *Ins. Co. of the W.*, 2011 WL 4738197, at *3 (finding there was no evidence of a good faith mistake or excusable neglect); *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 6184806, at *5 (finding defendants' failure to claim a mistake or excusable neglect sufficient for meeting this element). To the contrary, Defendants have had many opportunities to appear in the case, yet have chosen not to despite Testino appearing and participating in the related criminal proceedings, and PLS's agents and their attorneys having appeared to contest discovery served in this litigation in other jurisdictions. *See* Notice of Attorney Appearance, *United States v. Jose M. Gonzalez-Testino*, No. 4:19-cr-00341 (S.D. Tex. Aug. 31, 2018); *see generally Citgo Petroleum Corp. v. Petroleum Logistics Serv. USA, Inc.*, No. 22-cv-20762 (S.D. Fla.); *Citgo Petroleum Corp. v. Petroleum Logistics Serv. Corp.*, No. 22-mc-00129 (D.P.R.).

Fifth, because there is no excuse for Defendants' failure to respond to the Complaint, particularly since Defendants had more than adequate time to appear and file an answer or some motion contesting this case, a default judgment is just and appropriate. *Ins. Co. of the W.*, 2011 WL 4738197, at *3 ("Defendant has had ample time to answer, mitigating the harshness of a default judgment."); *Morales v. Rausch Grp. & Assocs., LLC*, No. 3:19-CV-2850-B, 2020 WL 6583023, at *3 (N.D. Tex. Nov. 10, 2020) (holding default judgment was not overly harsh where defendant had "failed to respond to [Plaintiff's] complaint for nearly a year"). This is especially so given that Testino has admitted to committing the

very acts substantiating Defendants' liability and the damages suffered in this case.  The

criminal information to which Testino[12] pleaded states:

> GONZALEZ, his employees, and his co-conspirators discussed . . . how they would obtain and retain contracts and other business advantages with PDVSA by providing things of value to PDVSA officials.   GONZALEZ paid bribes to PDVSA officials . . . to secure improper business advantages, . . . including, but not limited to
>
> a. helping GONZALEZ's companies win PDVSA contracts to supply equipment and services, including logistics services;
>
> b. providing GONZALEZ inside information about the PDVSA bidding process;
>
> c. helping to conceal the fact that GONZALEZ controlled multiple companies on certain bidding panels for PDVSA projects . . . .

Ex. 3 ¶¶ 21–22; Minute Entry for Testino Guilty Plea (admitting to all counts of the

information).

Sixth, there are no reasons why a court would need to set aside a judgment against

Defendants were it to be granted.  *Ins. Co. of the W.*, 2011 WL 4738197, at *3 (finding that

"based on the facts known to the Court at this time, there does not exist any 'good cause'

for which it would be obligated to set aside the default if challenged by Defendant").  In

fact, although the entry of a default judgment is an extreme remedy, a "Court has no choice

but to enter a default judgment" when Defendants "fail[] to participate in the adversarial

process."  *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 6184806, at *5.  Testino's and his co-

---

[12] The information refers to Testino as "GONZALEZ."  It defines "PDVSA" to include CITGO.  Ex. 3 ¶¶ 2–3.

conspirator's admissions to the underlying acts at issue here further reduce the risk that the

Court would later need to set aside a judgment against Defendants.

**V.    Liability:  The Complaint Establishes Each Of CITGO's Claims Against PLS
And Testino**

Having determined that the *Lindsey* factors weigh in favor of granting a default

judgment, the Court must next evaluate the Complaint to determine if it contains sufficient

factual bases to establish each of CITGO's claims.  Here,

> the role of a district court in adjudicating a motion for default
> judgment is limited.  Though the Federal Rules of Civil
> Procedure allow trial courts, before granting a default
> judgment, to "conduct hearings or make referrals" in order to
> "establish the truth of any allegation by evidence," Fed. R. Civ.
> P.  55(b)(2), longstanding precedent circumscribes that
> factfinding authority.  "The defendant, by his default, admits
> the plaintiff's well[-]pleaded allegations of fact."  Thus, **the
> district court takes as true the facts asserted by a plaintiff
> against a defaulting defendant**.

*Escalante v. Lidge*, 34 F.4th 486, 492 (5th Cir. 2022) (quoting *Nishimatsu Constr. Co. v.

Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)) (emphasis added); *see also Thomas

v. Hopkins*, No. 3:20-CV-576-S (BK), 2021 WL 4268483, at *2 (N.D. Tex. Aug. 26, 2021)

(holding that, in order to enter a default judgment, the court must find there is a "sufficient

basis in the pleadings and incorporated documents" for that judgment).  Whether a

complaint's allegations are "well-pleaded" for this purpose is evaluated under the familiar

"low threshold" of FRCP 8 and the *Twombly/Iqbal* standard: that is, the allegations "need

only 'be enough to raise a right to relief above the speculative level.'"[13]   *Wooten v.*

---

[13] Fraud claims are an exception to this rule.  Fraud claims, including the Texas fraud claim
CITGO alleged, are "subject to the heightened pleading requirements of [Federal] Rule [of

*McDonald Transit Assocs., Inc.*, 788 F.3d 490, 497–98 (5th Cir. 2015) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In conducting this analysis, the Court must

assume "that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.*

The Court may also consider evidence that bolsters or fleshes out the allegations of the

Complaint.  *Id.* at 500; Fed. R. Civ. P. 55(b)(2).

The following sections analyze CITGO's breach of contract, fraud, and RICO

claims, and demonstrate that the pleadings sufficiently establish those claims.

### A.    PLS Breached Its Agreement With CITGO

#### 1.    <u>Texas Law Applies Under Choice Of Law Analysis</u>

Texas law applies to CITGO's contract claims because PLS and CITGO specified

in the Agreement that it would be "governed by and construed in accordance with the laws

of the State of Texas without Preference to its conflict of law rules and statutes."  Compl.

¶ 25.  This Court must apply the choice-of-law rules of the forum state, and Texas law

typically enforces choice-of-law provisions in contracts, unless another jurisdiction has (1)

a more significant relationship with the parties, (2) a materially greater interest than the

chosen state, and (3) a "fundamental policy" that "would be contravened by the application

of the law" of the state chosen in the contract.  *Access Telecom, Inc. v. MCI Telecomms.*

*Corp.*, 197 F.3d 694, 704–05 (5th Cir. 1999).  No other jurisdiction has a more significant

---

Civil Procedure] 9(b)," specifically requiring allegations of the "time, place, and contents
of the false representations, as well as the identity of the person making the
misrepresentation and what he obtained thereby."  *Taylor v. Rothstein Kass & Co., PLLC*,
No. 3:19-CV-1594-D, 2020 WL 554583, at *8 (N.D. Tex. Feb. 4, 2020) (internal citations
omitted).  As described *infra* Section V.B., those requirements are easily met here.

relationship with the parties, nor would any jurisdiction's policy be violated by Texas law being applied.  Therefore, Texas law applies to CITGO's contract claims.

### 2.   CITGO And PLS Entered Into A Valid Contract Under Which CITGO Fully Performed

Under Texas law, the elements of a breach of contract claim are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *Shawn Ibrahim, Inc. v. Hous.-Galveston Area Loc. Dev. Corp.*, 582 S.W.3d 753, 767 (Tex. App. 2019) (citing *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App. 2009)).  As stated in the Complaint, on March 5, 2014, CITGO and PLS entered into a written and signed contract (the Agreement), pursuant to which PLS, in exchange for a commission fee, would provide procurement and logistics services in order to facilitate the sale and transportation of equipment, goods and/or materials to CITGO's ultimate parent corporation, PDVSA, the state-owned oil and natural gas company of the Bolivarian Republic of Venezuela.  Compl. ¶¶ 1, 4, 28–29, 64.[14]  The first element of CITGO's breach of contract claim is therefore satisfied.

Likewise, with respect to the second element, CITGO performed under the contract. From 2015 to 2018, CITGO entered into numerous transactions to procure goods using PLS as the procurement and logistics vendor.  *Id.* ¶ 31.  In exchange for these goods and services, CITGO paid PLS and (at PLS's direction) PLS-affiliated entities over $20 million

---

[14] A copy of the executed contract is attached hereto as Exhibit 9.

in exchange for PLS's alleged performance of its logistics-related obligations under the Agreement. *Id.* ¶¶ 4, 16, 31, 77; *see also Okonkwo v. Schlumberger Tech. Corp.*, CIV.A. No. H-11-2678, 2013 WL 6248695, at *2 n.12 (S.D. Tex. Dec. 3, 2013) (finding that a valid contract was formed and fully performed by defendant when defendant performed its only obligation, paying plaintiff the agreed-upon consideration).

### 3. PLS Breached The Agreement In Three Ways

As for the third element, PLS breached the contract through: (1) PLS's failure to provide services in compliance with all applicable laws, in violation of Sections 7, 19(a) and 23 of the Agreement; (2) PLS's failure to comply with the prohibitions against paying fees or dispensing gifts or favors to CITGO employees, in violation of Section 18 of the Agreement; and (3) PLS's failure to disclose its common ownership of vendors through which PLS performed services for CITGO, in violation of Section 18 of the Agreement.

### a. *PLS Breached Its Agreement With CITGO By Failing To Comply With Applicable Laws*

PLS breached multiple provisions of the Agreement by failing to comply with applicable laws, starting before the Agreement was signed and continuing through the time of PLS's final transactions with CITGO. PLS promised in Section 7(e) of the Agreement that it would "provide the Services in full compliance with all applicable national, regional and local laws, rules, regulations, ordinances, orders, decisions and decrees of any governmental authority, whether now or hereinafter in effect." Compl. ¶ 44. PLS further promised in Section 19(a) that PLS would "in the performance of all of its rights and obligations under this Agreement, comply with all applicable laws, rules and regulations

issued by applicable governmental authorities." *Id.* ¶ 45.  PLS also agreed in Section 23 that it would, "in the performance of this Agreement, comply with all applicable laws and regulations." *Id.* ¶ 46.

In breach of these material promises and representations to CITGO, PLS and its indirect owner, Testino, had begun paying bribes to CITGO employees to induce CITGO to enter into the Agreement with PLS.  *Id.* ¶ 40; *see also* Ex. 4 at 12 (De Jongh's Plea Agreement in which he admitted to accepting bribes from Testino in exchange for "taking steps to ensure that one of [Testino's] companies[, PLS,] was selected by Citgo for a contract to provide Citgo with logistics services to obtain goods and ship them to Venezuela.").  Moreover, after the Agreement's execution, PLS and Testino (on behalf of PLS) paid bribes for particular procurement transactions conducted under the terms of that Agreement.  Compl. ¶ 41; *see also* Ex. 17 ¶¶ 4–6.  PLS and Testino kept a spreadsheet tracking the bribe payments paid for each PLS procurement, with certain CITGO employees receiving payments based on a percentage of the cost of the purchase order.  Ex. 12; Ex. 17 ¶ 6.

These bribes violated both Texas state law prohibiting commercial bribery and the FCPA, both of which were laws applicable to the Agreement.  Compl. ¶¶ 68–69.  Testino and his bribe recipients admitted as much under oath in various criminal pleadings.  Ex. 3 ¶¶ 21–22 (criminal information charging Testino, which states that Testino "paid bribes to [CITGO] officials . . . to secure improper business advantages, . . . including, but not limited to[,] helping [Testino's] companies win [CITGO] contracts to supply equipment and services, including logistics services; [and] providing [Testino] inside information about

the [CITGO] bidding process"); Minute Entry for Testino Guilty Plea (admitting to all counts of the information, including conspiring to violate the FCPA and violating the anti-bribery provisions of the FCPA); Ex. 4 at 12, 14–15 (De Jongh plea agreement in which he admits to receiving over $3 million in bribes from Testino and associates in addition to tickets to entertainment events in exchange for facilitating, among other things, CITGO entering into the Agreement and the Shareholder Procurement Group awarding Testino-controlled entities purchase orders); Ex. 11 at 11 (Pena plea agreement in which she admits to accepting bribes from Testino and his associates); Ex. 17 ¶ 4 (same).

With respect to Texas law, Section 32.43 of the Texas Penal Code prohibits both the giving and receiving of commercial bribes. The law is structured such that the offense of paying bribes is defined in reference to the offense of receiving bribes. Under Section 32.43(b) of the Texas Penal Code, a "person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary." For purposes of this statute, a "fiduciary" includes an agent or employee. Tex. Penal Code § 32.43(a)(2)(A). Thus, the CITGO employees who accepted bribes (*e.g.*, Pena, De Jongh) in exchange for improperly assisting PLS in obtaining specific procurements were violating Section 32.43(b).

Those violations by Pena and De Jongh define the violation by PLS and Testino. That is, Section 32.43(c) states that a "person commits an offense if he offers, confers, or agrees to confer any benefit the acceptance of which is an offense under Subsection (b),"

- 31 -

violation of which is a felony.  *Id.* § 32.43(c).  Because the benefits received by Pena, De Jongh, and others violated that law, PLS and Testino violated the law by providing those things of value.  Compl. ¶¶ 5, 10, 38–40, 69, 72.

Defendants' bribe payments to CITGO employees for the benefit of PLS also violated the FCPA.  CITGO employees are "foreign officials" for purposes of the FCPA by virtue of being employees of a subsidiary of an instrumentality of the Bolivarian Republic of Venezuela (namely, PDVSA).  *Id.* ¶ 5; 15 U.S.C. § 78dd-2(h)(2)(A) (defining "foreign official" to include an employee of any "instrumentality" of a foreign government).  Thus, PLS's bribery of CITGO employees to induce those employees to misuse their positions to help secure business for PLS violated the anti-bribery provisions of the FCPA.  Compl. ¶¶ 5, 10, 38–40, 69, 72.  In fact, Testino pleaded guilty to one count each of conspiracy to violate the FCPA and violation of the anti-bribery provisions of the FCPA, and his FCPA violations are predicated, in part, on bribe payments to CITGO employees.  *Id.* ¶ 8.

Accordingly, the Complaint's well-pleaded allegations establish that PLS breached Sections 7(e), 19(a), and 23 of the Agreement through its failure to comply with applicable state and federal law while providing services to CITGO, including through Defendants' violations of the FCPA and violations of the Texas Penal Code.

> b.    *PLS Breached Its Agreement With CITGO By Providing Payments And Gifts To CITGO Employees*

PLS represented in Section 18 of the Agreement that neither PLS nor "anyone acting on [its] behalf will directly or indirectly pay (a) any salaries, commissions or fees of any kind, or (b) dispense favors, gifts or entertainment of greater than token or nominal value

to the other party employees or any members of their families." *Id*. ¶ 49.  Despite this material assurance, PLS breached this agreement by making payments and providing gifts to CITGO employees to secure contracts on behalf of PLS and other entities controlled and indirectly owned by Testino.  *Id*. ¶¶ 5, 10, 12–13, 21, 38–40, 50–51, 72.

These allegations are further supported by the evidence developed in discovery. Specifically, PLS, Testino, and his affiliates kept spreadsheets documenting the payments of commissions and gifts.  *E.g.*, Ex. 12 (spreadsheet recording payments made to CITGO employees; those payments were a percentage of the cost of purchase orders made through PLS); Ex. 17 ¶ 6 (discussing the spreadsheet recording payments to CITGO employees); Ex. 19 (spreadsheet showing gifts given to CITGO employees); Ex. 20 (same).  CITGO employees have also admitted as part of plea agreements to receiving funds from Testino as inducements to cause CITGO to contract with PLS and advantage other entities Testino controlled.  Ex. 4 at 12–15 (De Jongh); Ex. 11 (Pena).

> c.      *PLS Breached Its Agreement With CITGO By Failing To Disclose Conflicts Of Interest*

PLS represented in Section 18 of the Agreement that PLS "shall immediately disclose to CITGO any common ownership between Contractor [PLS] and any vendor or service provider through which Contractor performs the Services."  Compl. ¶ 52.  Those Services included "procurement" services.  *Id*.; *see also* Ex. 9 at 1.  PLS breached Section 18 of the Agreement by engaging in self-dealing by using other entities owned and controlled by Testino without notifying CITGO.  Compl. ¶¶ 53–57.  The evidence developed during discovery supports the Complaint's allegations.  *See* Ex. 6 ¶ 6

(declaration of ██████████████████████, that Ameritech Supplies, Ameritraders Group, Aziolarefin Olie Energie and Fabricage, Britco Consulting, Drill Corp., International SGL of Texas, Inc., Lexington Tech International, Petroleum Equipment Petequip Corp. ("Petequip"), RH International Consulting, SGL Technic, Stang Industrial Products, Thomas Pipe and Steel, and Worldwide Ironcarb were controlled by Testino and were used to fulfill purchase orders from CITGO); Ex. 7 at 36, 47–54, 59, 73–74 (deposition from former PLS employee Ruben Gonzalez that Ameritech Supplies, Lexington Tech International, Petequip, Rexel Consolidated, Inc., SGL Technic, and Stang Industrial Products were affiliated with Testino); Ex. 15 at 21–22, 151–54 (deposition from former PLS USA President that Lighthouse Forwarding, PLS USA, and PLS were affiliates); Ex. 17 ¶¶ 4–5 ("Among the payments I received from Testino were payments that I [Pena] understood were related to purchase orders that I caused CITGO to award to PLS"); Ex. 22 (a list of contacts for entities controlled by Testino).

Through PLS, CITGO made purchases from many of the above-listed entities or PLS engaged the entities to provide services for CITGO. *See* Compl. ¶¶ 78, 82, 86, 92, 104; Ex. 23 (a spreadsheet generated by CITGO Finance of transactions with PLS and other Testino entities); Ex. 24 and Ex. 25 (invoices and other supporting documentation reflecting transactions between PLS and Ameritraders and Worldwide Ironcarb in connection with PLS's work for CITGO).[15]   At no time did PLS disclose its or Testino's

---

[15] As reflected in some of these documents, PDVSA at times provided estimates as to the cost of the goods to be purchased.  Based upon the documents received in discovery, work by CITGO's Internal Audit Department, and the declaration of █████████████████, as well as the report by damages expert James V. Farrell of the Berkeley Research Group,

affiliation with these entities.  Compl. ¶¶ 53–55; *see also* Ex. 4 at 12 (defining PLS as "one of [Testino's] companies").[16]  Accordingly, PLS breached Section 18 of the Agreement by failing to disclose its conflict of interest.

### 4.    CITGO Was Damaged By PLS's Breaches[17]

CITGO sustained significant damages as a result of these breaches.  Because PLS and Testino (on PLS's behalf) provided gifts and bribes to CITGO employees, in violation of federal and Texas law, PLS and other Testino-affiliated entities were able to charge significantly higher prices by corrupting certain CITGO employees into misusing their positions to award contracts to PLS and its affiliates at costs that were highly unfavorable to CITGO.  Compl. ¶¶ 13, 16, 54, 56, 73, 106.  This included the 5.75% fee PLS charged, which was higher than what CITGO could have obtained in the fair market, as well as the other expenses PLS charged to CITGO.  *Id.* ¶¶ 12, 13, 16, 54; *see also* Ex. 10 ¶¶ 55–70 (expert report describing that the commission rate and other fees charged were significantly above-market).  It also included higher prices on the goods sold by Testino-affiliated entities through PLS, which in turn led to a higher fee for PLS given the percentage structure of that fee.  Compl. ¶¶ 13, 16, 54, 56, 73, 106; *see also* Ex. 10 ¶¶ 36–54, 66–67

---

Testino-controlled entities were significantly inflating the cost of the goods sold to CITGO. Given this, the estimated costs provided by PDVSA were wholly inaccurate.

[16] The guilty plea does not name PLS, but instead refers to it as a company "selected by Citgo for a contract to provide Citgo with logistics services to obtain goods and ship them to Venezuela." Ex. 4 at 12.

[17] Because proving damages occurred is an element of breach of contract under Texas law, we briefly discuss the issue here.  A larger discussion of the type and magnitude of damages CITGO sustained is provided in Section VI.

(expert report detailing the inflated prices charged by Testino-affiliated entities and the effect that had on the prices paid by CITGO for these goods and PLS's 5.75% fee).

## B. PLS Fraudulently Induced CITGO To Enter Into The Agreement

PLS's assurances to CITGO—offering material representations of its compliance with applicable law despite it and its owner's (Testino) then-ongoing bribery of CITGO employees—fraudulently induced CITGO to enter into the Agreement.  Under Texas law, the elements of fraud are:

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Taylor*, 2020 WL 554583, at *8 (quoting *Choe v. Bank of Am., N.A.*, No. 3:13-CV-0120-D, 2013 WL 3196571, at *5 (N.D. Tex. June 25, 2013)).

CITGO has pleaded, and PLS by its default has conceded, that in the Agreement, PLS made a material representation to CITGO that PLS would "provide the Services in full compliance with all applicable national, regional and local laws, rules, regulations, ordinances, orders, decisions and decrees of any governmental authority, whether now or hereinafter in effect."  Compl. ¶¶ 25, 44, 90–93.  "A representation is material if the representation was important to the plaintiff in making a decision, such that a reasonable person would be induced to act on and attach importance to the representation in making the decision."  *Maxim Crude Oil, LLC v. Noil Corp.*, No. 2:21-CV-90, 2021 WL 5154793, at *2 (S.D. Tex. May 24, 2021) (quoting *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019)).  Moreover, a "promise to do an act in the future is

actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act." *BMC Software, Inc. v. Int'l Bus. Mach. Corp.*, No. CV H-17-2254, 2022 WL 1733106, at *43 (S.D. Tex. May 30, 2022) (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986)).

CITGO considered PLS's representation that it would perform its services in compliance with the law to be material, as any reasonable contracting party would. It is important to any contracting party that its counterparty perform its contractual duties legally so that the party may enjoy the full benefit of the counterparty's performance as well as avoid any costs or damages that might be incurred if such contractual duties were performed in violation of the law.

PLS made its representation that it would comply with all applicable laws knowing at all relevant times that it was false. At the time PLS made the representation, (i) PLS knew it and Testino (on PLS's behalf) had bribed CITGO employees in order to obtain the Agreement, in violation of Texas and federal law, and (ii) PLS knew it intended to continue such bribery in order to receive purchase orders under the Agreement. Compl. ¶¶ 5, 40–41, 72, 92–94; *see also* Ex. 12; Preliminary Examination / Detention Hearing, *United States v. Jose Manuel Gonzalez-Testino*, No. 4:19-cr-00341, at 21–23 (S.D. Tex. Oct. 1, 2018), Ex. 13 at 21–23 (testimony of Special Agent Corbin Wickman, Department of Homeland Security, in which he stated that a PLS representative "assisted in [the] payments of bribes"); Ex. 4 at 12 (De Jongh admitted in his plea agreement that in exchange for bribes he took "steps to ensure that one of [Testino's] companies was selected by Citgo for a

contract to provide Citgo with logistics services to obtain goods and ship them to Venezuela").

Furthermore, PLS's false representation was made with the intent that it would be acted upon by CITGO.  A party's intent, which is a fact question, can be inferred from the full spectrum of a party's actions, including actions taken subsequent to the making of the representation.  *BMC Software, Inc.*, 2022 WL 1733106, at *43 (in determining intent, a court looks to both the time the representation is made and "subsequent acts" to infer intent); *see also Spoljaric*, 708 S.W.2d at 435 ("'Slight circumstantial evidence' of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.") (quoting *Maulding v. Niemeyer*, 241 S.W.2d 733, 738 (Tex. Civ. App. 1951)).

PLS clearly intended for CITGO to rely upon its false representations.  PLS knew CITGO would not enter into a contract if CITGO knew its counterparty would engage in illegal conduct.  Compl. ¶ 48.  In particular, CITGO would not have entered into a contract with PLS had it known PLS intended to corrupt some CITGO employees to win the Agreement and business under it, and to defraud CITGO into paying grossly inflated commissions and prices for the purchased goods.  That PLS hid this bribery, while representing it would not orchestrate such a bribery scheme, is proof of PLS's motive and intent, specifically that PLS wanted CITGO to rely on this misrepresentation.  *See id.* ¶ 34 (PLS concealed its connection to Testino after Testino's arrest to hide PLS's role in the bribery scheme); *BMC Software, Inc.*, 2022 WL 1733106, at *43, 45 (subsequent efforts to

hide a failure to comply with a misrepresentation demonstrate an intent not to comply with the representation at the time it was made).

CITGO relied upon PLS's misrepresentation and was substantially injured as a result of that reliance. Compl. ¶ 73. Had it been aware of the fraud by PLS, CITGO would not have entered into the Agreement and transactions under it, thereby avoiding the massive overpayments made by CITGO to PLS and its affiliates. CITGO paid over $20 million to PLS and affiliated entities between 2014 and 2018 for purported logistics and procurement services, and, as detailed below in Section VI.A.1.a.ii. and iii., at a minimum, over $12 million of that was above market value for the services provided ($8.6 million in inflated commission and $3.8 million in inflated reimbursable expenses for freight, delivery, etc.). Compl. ¶¶ 13, 16, 31, 106; Ex. 10 ¶¶ 55–70. Likewise, CITGO paid at least $72 million above market value for goods PLS procured on CITGO's behalf from Testino-affiliated vendors. Compl. ¶ 41; Ex. 10 ¶¶ 36–54; *infra* Section VI.A.1.a.i. In addition, CITGO incurred significant legal fees associated with investigating and remediating these matters and bringing this action. Compl. ¶ 18.

State law fraud claims are also "subject to the heightened pleading requirements of [Federal] Rule [of Civil Procedure] 9(b)," specifically requiring allegations of the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Taylor*, 2020 WL 554583, at *8 (internal citations omitted). The Complaint readily establishes these requirements. The contents of the misrepresentation are stated in the Agreement, and the misrepresentation was made at the time of execution of the Agreement. Compl. ¶¶ 43–48. Moreover, the

misrepresentation was made by PLS, the signatory to the contract, and sent to CITGO by the signer and PLS representative, Ruben Gonzalez. *Id*. ¶¶ 43–48, 64. Thus, the time, place, and content of the false statements, as well as who made them, was alleged in the Complaint (and has subsequently been conceded by Defendants). Moreover, as described throughout this Motion, the Complaint and additional supporting evidence detail the amounts in inflated commissions and purchase order prices that PLS and Testino obtained as a result of their misrepresentations.

### C.    PLS And Testino Are Liable To CITGO For Their Civil RICO Violations

Private plaintiffs who are injured in their business or property by reason of a defendant's violation of the RICO statute have a civil cause of action to recover their damages, trebled under the statute. *See* 18 U.S.C. § 1964(c); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006). Here, CITGO has alleged, and Defendants have conceded through their default, that PLS and Testino conducted an enterprise whose activities affected interstate commerce and that both PLS and Testino conducted, and participated in the conduct of, the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Compl. ¶¶ 60–74, 101–107. In addition, PLS and Testino conspired among themselves and with others to violate 18 U.S.C. § 1962(c), which itself constitutes a violation of 18 U.S.C. § 1962(d). *Id.* ¶¶ 60–74, 108–112.

1.   <u>PLS And Testino Were Associated With An Enterprise Engaged In Interstate And Foreign Commerce And Participated In The Enterprise's Affairs Through A Pattern Of Racketeering In Violation Of RICO</u>

Under the federal RICO statute, it is unlawful for (1) "any person" (2) "employed by or associated with any enterprise" (3) "engaged in, or the activities of which affect, interstate or foreign commerce" (4) "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs" (5) "through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  In addition to those substantive elements of a RICO violation, a civil plaintiff must also establish that the defendant's violation was a but-for and proximate cause of an injury to the plaintiff's business or property.  *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016) (en banc).  CITGO has pleaded, and PLS and Testino have conceded by their default, each of these elements of CITGO's civil RICO claim, as described below.

a.   *PLS And Testino Are Persons And Are Distinguishable From The RICO Enterprise*

To satisfy the "person" element under Section 1962(c), courts require defendants to be identifiable individuals or entities that are separate and distinguishable from the alleged RICO "enterprise."  *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 447 (5th Cir. 2000) (holding that "each participant in the enterprise may be a 'person' liable under RICO, but the association itself cannot be," and adding that a "corporation obviously qualifies as a 'person' under RICO and may be subject to RICO liability") (quoting *Haroco, Inc. v. Am. Nat'l Bank & Tr. Co.*, 747 F.2d 384, 401 (7th Cir. 1984)).  Here, as stated in the Complaint, Testino, PLS, and others formed a separate "association-in-fact" (described in the next

section) designed to enrich Testino and his co-conspirators with lucrative contracts for entities controlled by Testino, including PLS.  Compl. ¶ 61.  This association was created to execute the illegal enrichment scheme, and was therefore distinct from the operation of PLS, whose general business activity was the provision of logistics services.  *Id.* ¶ 2; *see, e.g.*, *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 650 (S.D. Tex. 2016) (association-in-fact enterprise of Greater Houston Interventional Pain Associates, PA and two individuals was distinct from the individuals/entity making up the association because the "normal affairs" of the entity "include[d] provision of pain management services," whereas the association-in-fact enterprise was alleged to be performing "unnecessary procedures and charging inflated rates in automobile accident cases").  Thus, the Defendants here are distinct from the enterprise and can be held liable for RICO violations.

b.   *PLS And Testino Formed An Association-In-Fact Enterprise*

An association-in-fact enterprise is broadly defined under RICO to be "simply a continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 938, 948 (2009).  The enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods." *Id.*  Members of the enterprise "need not have fixed roles" and the enterprise "need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies."  *Id.*  Although the enterprise must "be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts," that continuity can be established "if the individuals associate together to commit several criminal acts."  *Ocean Energy II, Inc. v. Alexander &*

*Alexander, Inc.*, 868 F.2d 740, 748–49 (5th Cir. 1989) (quoting *Montesano v. Seafirst Commercial Corp.*, 818 F.2d 423, 427 (5th Cir. 1987)).  Indeed, the Fifth Circuit previously held that a complaint had sufficiently alleged the existence of an enterprise when it alleged that the "same persons . . . associated to commit the same predicate acts on at least one other occasion." *Id.* at 749.

PLS and Testino, along with their co-conspirators, formed an association-in-fact enterprise that worked together to obtain lucrative contracts and other business advantages for companies under Testino's control.  Compl. ¶ 61.  Evidence developed during discovery further supports the Complaint's allegations regarding this point.  *See* Ex. 7 at 27, 68–69 (transcript from Ruben Gonzalez's deposition, a former PLS employee, in which Gonzalez explains that Testino and several companies controlled by him shared enterprise resource planning software so that Testino and others could monitor the collective performance of the companies); Ex. 6 ¶ 15 (a declaration from ██████████████████████ █████████████████████████, and who described bribes paid by Testino so that (1) PLS would be selected by CITGO to provide logistics services at a significantly inflated price and (2) the supplier of the goods to be purchased would be Testino-controlled entities); Ex. 17 ¶¶ 4–6 (money received by former CITGO employee was "related to purchase orders that [she] caused CITGO to award to PLS").

PLS and Testino paid bribes to certain CITGO employees on numerous occasions in order to induce CITGO to enter into the Agreement.  Compl. ¶ 40.  PLS and Testino also bribed CITGO employees to allow PLS to purchase goods and services at inflated prices from other companies affiliated with Testino.  *Id.*  Thus, PLS and Testino functioned with

a common purpose (along with their co-conspirators) to enrich Testino and his co-conspirators by obtaining lucrative contracts for entities indirectly owned or controlled by Testino. PLS and Testino (as well as other co-conspirators) achieved this by associating together from 2012 through July 2018 to commit multiple criminal acts, as detailed below and in the Complaint. *Id.* ¶¶ 10, 20–21, 30–31, 38–41, 53, 60–61, 68–72; *see also* Ex. 13 at 21–23 (testimony of Special Agent Corbin Wickman, Department of Homeland Security, in which he stated that Johana Haddad, an employee of Testino companies, tracked in a spreadsheet the bribe payments made to CITGO employees in exchange for PLS purchase orders and assisted in the payment of bribes); Ex. 17 ¶¶ 4–7 (former CITGO Shareholder Procurement employee swearing that Haddad provided money on behalf of PLS to her in exchange for helping PLS obtain business from CITGO); Ex. 3 ¶¶ 17–27 (charging Testino with conspiracy to violate the FCPA by paying bribes to CITGO employees); Minute Entry for Testino's Guilty Plea (pleaded guilty to the FCPA conspiracy count and other charges).

       c.    *The Enterprise Formed By PLS And Testino Engaged In Interstate Commerce And Activities Affecting Interstate Commerce*

For a RICO claim under Section 1962(c), a plaintiff must show that the enterprise engaged in interstate or foreign commerce or activities affecting interstate or foreign commerce. The Fifth Circuit has held that a RICO plaintiff need not show more than a "minimal" nexus between the enterprise and interstate commerce. *Cowan v. Corley*, 814 F.2d 223, 227 (5th Cir. 1987). Here, the enterprise engaged in interstate commerce through logistics and procurement transactions with CITGO that involved the shipping of goods either into or outside of the United States. Compl. ¶ 63; *see United States v. Robertson*,

514 U.S. 669, 672 (1995) (holding an enterprise is engaged in interstate commerce when it is "directly engaged in the production, *distribution, or acquisition of goods or* services in interstate commerce") (emphasis added) (quoting *United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 283 (1975)).  PLS and Testino also regularly sent emails and other electronic messages in interstate and foreign commerce to further their racketeering activity.  Compl. ¶¶ 64–65.  Such conduct, which utilizes an instrumentality of interstate and foreign commerce, affects interstate commerce.  *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (the use of an instrumentality of interstate commerce, in this case pagers and telephones, constitutes actions affecting interstate commerce for purposes of RICO); *see also* Ex. 3, at 6–7, 17, 21 (the information, to which Testino pleaded, states that Testino made "use of the . . . instrumentalities of interstate commerce corruptly in furtherance of" bribes to CITGO employees).  Moreover, interstate commerce includes travel between states or into or out of the United States.  *See United States v. Guidry*, 406 F.3d 314, 321 (5th Cir. 2005).  Testino and employees and agents of PLS (and hence PLS) traveled between states and between the U.S.  Compl. ¶ 66.

> d.   *PLS And Testino Participated In And Conducted The Enterprise's Affairs*

The Supreme Court has held that to establish a RICO offense under Section 1962(c), one must show that each defendant "participated in the operation or management of the enterprise itself."  *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).  The Court made clear that this test did not limit liability to upper management of the enterprise as "lower

rung participants" could "participate" in the "operation" of the enterprise.  *Id*. at 183–84; *see also United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998).

As stated in the Complaint, both PLS and Testino participated in the enterprise. Both paid bribes to some CITGO and PDVSA employees to further the purpose of the enterprise—the enrichment of Testino and his co-conspirators—by corrupting certain CITGO employees to award PLS and other entities related to PLS and Testino contracts. Compl. ¶¶ 5, 12–13, 69, 72; *see also* Ex. 17 ¶¶ 2–7.  Both PLS and Testino employees (and thereby PLS) traveled and communicated with CITGO employees to further the enterprise's goals.  Compl. ¶ 68.  And both engaged in the operation of the enterprise through logistics and procurement transactions with CITGO.  *Id*. ¶ 63.

> e.   *The Association-In-Fact Enterprise Formed By PLS And Testino Engaged In A Pattern Of Racketeering Activity*

To establish a pattern of racketeering activity, a plaintiff must establish (i) that racketeering activity occurred; and (ii) that such activity constituted a pattern.

> i.   PLS And Testino Engaged In Racketeering Activity

The RICO statute defines what predicate offenses constitute "racketeering activity." These include violations of the Travel Act, the federal money laundering statutes, and any act involving bribery that "is chargeable under State law, and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1).  With respect to these predicate offenses, a defendant does not need to be *convicted* of the predicate offenses to be liable for a RICO violation; the plaintiff must merely establish the elements of the relevant predicate offenses under a preponderance of the evidence standard.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S.

479, 491–500 (1985); *see Grynberg v. BP, P.L.C.*, 527 F. App'x 278, 282–83 (5th Cir. 2013);

*Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 481 (5th Cir. 1986).

From at least 2012 to 2018, the PLS and Testino enterprise engaged in numerous predicate acts, including violations of the commercial bribery provisions of the Texas Penal Code, violations of the Travel Act (by way of interstate travel in furtherance of FCPA violations), and federal anti-money laundering violations (18 U.S.C. § 1956), many of which they or their co-conspirators admitted to committing in separate related criminal proceedings.[18]

      (1)    The PLS And Testino Enterprise Violated The Commercial Bribery Provisions Of The Texas Penal Code

PLS and Testino's actions in bribing CITGO employees constitute violations of the commercial bribery provisions in the Texas Penal Code. As discussed above, under Texas law, it is illegal to confer any benefit upon an employee of a company if the employer does not consent to the benefit and the benefit is provided in exchange for the employee taking some action with respect to the affairs of his/her employer. Tex. Penal Code §§ 32.43(a)(2)(A), 32.43(b), 32.43(c). As described in the Complaint, and as conceded by Defendants due to their default, PLS and Testino paid cash and provided gifts, entertainment, and the use of housing for free or below-market rates to CITGO employees

---

[18] In addition to these predicate acts, the Complaint also pleads all of the elements of the federal wire fraud statute, 18 U.S.C. § 1343, for multiple violations. *See* Compl. ¶¶ 11, 33–34, 54–56, 64–65, 67, 72, 104. In the interests of judicial economy, we are not seeking leave to amend the Complaint to add these violations.

to assist PLS and other Testino-controlled entities in obtaining contracts and purchase orders from CITGO.  Compl. ¶¶ 5, 38–41, 69, 72; *see also* Ex. 3 ¶¶ 22–23 (Testino and his co-conspirators provided cash, "private jet travel, recreational travel including plane tickets and hotel accommodations, Super Bowl and other sports tickets, meals, entertainment, and luxury consumer goods, including jewelry and watches," and an apartment in exchange for CITGO employees helping PLS win contracts and helping Testino-controlled entities obtain confidential bidding information); Ex. 4 at 12, 14–15 (De Jongh accepted from Testino and his associates "monetary payments . . . and other things of value, . . . including attending a World Series game in San Francisco, California, in October 2014, attending the Super Bowl in Glendale, Arizona in February, 2015, and receiving tickets to a U2 concert in June 2017" in exchange for (1) PLS securing the Agreement and (2) CITGO selecting Testino-controlled entities to provide goods); Ex. 11 at 12, 14 (Pena accepted from Testino and his associates cash, flights, and hotel stays in exchange for helping PLS obtain business); Ex. 17 (Pena accepted cash and gifts, including concert and baseball tickets, from PLS and Testino in exchange for purchase orders she caused CITGO to award to PLS); Ex. 12 (reflecting cash payments paid to CITGO employees and calculated as a percentage of the total amount of individual purchase orders awarded by CITGO to PLS); Ex. 6 ¶¶ 12–15, 18 (CITGO employees received cash bribes as a percentage of purchase orders in exchange for awarding business to PLS and other Testino-controlled entities).

          (2)     The PLS And Testino Enterprise Engaged In Violations Of The Travel Act

Additionally, the PLS and Testino enterprise violated the Travel Act, which prohibits:

> (1) travel or use of the mail or any facility in interstate or foreign commerce; (2) with the specific intent to promote, manage, establish, or carry on—or distribute the proceeds of—unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent subsequent to the act of travel or use of the mail or facility of interstate or foreign commerce.

*United States v. Cleveland*, No. CRIM. A. 96-207, 1997 WL 539677, at *9 (E.D. La. Aug. 26, 1997).

"Facility in interstate commerce" includes the use of text and other messaging apps, the internet, and email. *See United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) (text messages); *United States v. Hurst*, No. 3:14-CR-128-HTW-FKB-1, 2021 WL 3719133, at *1 (S.D. Miss. Aug. 20, 2021) (the internet); *United States v. Barker*, No. 3:16-CR-516-D, 2017 WL 4167512, at *16 (N.D. Tex. Sept. 20, 2017) (email).

"Unlawful activity" is defined by statute to include bribery in violation of federal law or the law of the state in which it was committed. 18 U.S.C. § 1952(b). This includes violations of the FCPA. *Pemex Exploracion y Produccion v. BASF Corp.*, Nos. H-10-1997, H-11-2019, 2013 WL 5514944, at *67 (S.D. Tex. Oct. 1, 2013); *see also Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, No. 14-cv-7349 (AJN), 2016 WL 1298987, at *7 (S.D.N.Y. Mar. 31, 2016) ("[A] violation of the Foreign Corrupt Practices Act . . . can be the basis for a Travel Act violation"). It also includes violations of the Texas commercial

bribery statute. *Barker*, 2017 WL 4167512, at *8–16 (Texas commercial bribery statute constitutes "unlawful activity" under the Travel Act).

Here, CITGO pleaded, and Defendants have conceded, that PLS and Testino traveled in interstate commerce and sent emails and messages through messaging apps (facilities of interstate commerce) to promote, manage, and carry on violations of the FCPA and the Texas commercial bribery statute. Compl. ¶¶ 64–68, 72; *see also* Ex. 3 ¶¶ 21, 27 (Testino used email and messaging services, including BlackBerry messages and encrypted electronic messaging services, to carry out his conspiracy). CITGO further alleged, and Defendants have conceded, that subsequent to those actions, PLS and Testino took additional steps in furtherance of the bribes, including payment of the bribes. Compl. ¶¶ 64–68, 72; *see also* Ex. 3 ¶¶ 22–23; Ex. 4 at 14–15; Ex. 11 at 12, 14; Ex. 12; Ex. 6 ¶¶ 12–15, 18.

     (3) The PLS And Testino Enterprise Violated Federal Money Laundering Statute 18 U.S.C. § 1956

The PLS and Testino enterprise laundered money in violation of 18 U.S.C. § 1956, which, by statute, is a predicate offense under RICO. *See* 18 U.S.C. § 1961(1)(B) (listing violations of 18 U.S.C. § 1956 as "racketeering activity"). Among the conduct criminalized under 18 U.S.C. § 1956 is the transmitting or transferring of funds into the U.S. from abroad with the intent to promote the carrying on of specified unlawful activity. 18 U.S.C. § 1956(a)(2)(A). "Specified unlawful activity" is defined by statute to include violations of the FCPA. 18 U.S.C. § 1956(c)(7)(D).

Here, CITGO pleaded, and Defendants conceded by their default, that PLS and Testino transferred funds from Switzerland and Curaçao to banks in Texas and Florida from at least 2012 to 2017 with the intent to promote the carrying on of violations of the anti-bribery provisions of the FCPA.  Compl. ¶¶ 39, 71–72; *see also* Ex. 3 ¶¶ 26, 28–38, 40 (discussing such transfer made by Testino and his co-conspirators).

> ii.   PLS And Testino's Conduct Constitutes A Pattern Of Racketeering Activity

A pattern of racketeering activity is established by two or more predicate offenses that are (1) "related" and (2) "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *see also Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir. 2007).  The second element is referred to as the "continuity requirement[]."  *Abell v. Potomac Ins. Co. of Ill.*, 946 F.2d 1160, 1165 (5th Cir. 1991).

Predicate acts are related when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  *Heller Fin., Inc. v. Grammco Computer Sales, Inc.*, 71 F.3d 518, 524 (5th Cir. 1996) (quoting *H.J. Inc.*, 492 U.S. at 240).  Here, the predicate acts all had the same purpose: the enrichment of Testino and his co-conspirators.  Compl. ¶ 61.  The predicate acts also had similar victims, namely CITGO and its corporate affiliates, including its parent company, PDVSA.  *Id.* ¶¶ 9, 61.  The recipients of the bribes were also all from the same set of individuals, employees of CITGO and/or PDVSA, many of whom worked within a single department at CITGO, the Special Projects Group.  *Id.* ¶¶ 8, 36.  As such, the predicate acts were clearly related.

With respect to the second prong, "continuity," the PLS and Testino enterprise constituted "closed-ended continuity," *i.e.*, "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 241–42.  Although the Supreme Court and Fifth Circuit have not set forth a definitive standard for what constitutes a "substantial period of time," conduct lasting almost four years is sufficient.  *United States v. Bustamante*, 45 F.3d 933, 941 (5th Cir. 1995).  Here, the Complaint alleges, and Defendants by their default concede, predicate acts from 2012 through 2018, a period of roughly *six* years.  Compl. ¶¶ 61, 68–72; *see also* Ex. 3 ¶ 17 (conspiracy to violate the FCPA began in 2012 and lasted "through at least 2018").  This is more than enough time to satisfy the requirement of continuity.

> f.   *CITGO Was Injured By PLS's And Testino's RICO Violations*

To recover damages for a civil claim under RICO, a plaintiff must show that it has been injured "by reason of" the RICO violation.  *Torres*, 838 F.3d at 636.  Doing so requires establishing "both but-for cause and 'proximate cause in order to show injury by reason of a RICO violation.'"  *Id.* (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008)).

> i.   But For PLS's And Testino's RICO Violations, CITGO Would Not Have Been Injured

But-for causation requires the plaintiff "to show merely that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct."  *United States v. Thompson*, 945 F.3d 340, 344 (5th Cir. 2019) (quoting *United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019)).  This standard is straightforward—it "asks simply whether the

outcome would have occurred in the absence of the action." *Salinas*, 918 F.3d at 466. Thus, an injury may have multiple but-for causes. *Id.*

Here, CITGO paid significantly inflated prices to PLS and other entities controlled by Testino, causing CITGO millions of dollars in losses, as detailed in Section VI. Compl. ¶¶ 69–73. Those losses would not have occurred but for Defendants' RICO violations. Had Defendants not bribed CITGO employees (in violation of Texas law and the FCPA), those employees would not have corruptly directed contracts and purchase orders to PLS and other Testino-controlled entities, given the hugely inflated prices those companies were charging and that the entities were typically shell companies without a legitimate business purpose. *Id.*; *see also* Ex. 6 ¶¶ 10, 18; Ex. 17 ¶ 4. Likewise, were it not for the Travel Act violations in furtherance of the bribes violating the FCPA, CITGO would not have engaged PLS and other Testino-controlled entities at inflated prices. Compl. ¶¶ 68, 73; *see also* Ex. 4 at 12 (bribes received were in exchange for business with CITGO); Ex. 11 at 11–12 (same). The laundered payments were the actual bribe payments to CITGO officials, meaning that without this money laundering, PLS and the other Testino-controlled entities would not have received (and CITGO would not have paid) the contracts and purchase orders with grossly inflated prices. Compl. ¶¶ 70–73. Defendants' RICO violations were therefore "but-for" causes of CITGO's injuries.

  ii. PLS's And Testino's RICO Violations Were The Proximate Cause Of CITGO's Injuries

Under the civil RICO statute, "[p]roximate cause should be evaluated in light of its common-law foundations [and] . . . requires some direct relation between the injury

asserted and the injurious conduct alleged.  When a court evaluates a RICO claim for proximate cause, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Torres*, 838 F.3d at 636 (internal quotation marks omitted).  Where, as here, there is "no plausible argument that the [plaintiff was an] unforeseeable victim[] or otherwise wronged by the caprice of chance," that "direct relation" requirement is satisfied.  *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 676 (5th Cir. 2015).  For example, in *Allstate Insurance Co. v. Plambeck*, the defendants allegedly orchestrated a scheme to recruit persons who were in car accidents but were not at fault.  *Id.* at 671.  These individuals would then submit claims for unnecessary chiropractic services that would be billed to the at-fault party's insurer.  *Id.*  The Fifth Circuit found that the RICO violations (based on predicate mail and wire fraud acts) were the proximate cause of the insurers' damages since the "objective of the enterprise was to collect from the insurance companies."  *Id.* at 676.

Similarly, here, Defendants targeted CITGO through their RICO violations.  The intent was to use bribery and other associated RICO violations to secure from CITGO contracts and purchase orders containing inflated pricing terms.  Compl. ¶¶ 61, 73.  There is "no plausible argument" that CITGO was anything but the immediate, foreseeable, and direct victim of those violations.  *Plambeck*, 802 F.3d at 676.  Testino and various of the co-conspirators admitted in separate related criminal proceedings that the purpose of the bribery was to secure these agreements from CITGO improperly.  *See, e.g.*, Ex. 3 ¶ 18 ("The purpose of the conspiracy was for [Testino] and his co-conspirators to enrich themselves by obtaining and retaining lucrative contracts and other business advantages

with PDVSA[19] through corrupt and fraudulent means, including by paying bribes to PDVSA officials."); Tulio Anibal Farias-Perez ("Farias") Criminal Information, *United States v. Farias*, No. 4:20-cr-00089 (S.D. Tex. Feb. 7, 2020), Ex. 26 ¶¶ 10–11 (Farias pleaded guilty to this information, which charged that Farias and Testino conspired together and that the "purpose of the conspiracy was for FARIAS and his co-conspirators to enrich themselves by obtaining and retaining lucrative contracts and other business advantages with PDVSA through corrupt and fraudulent means, including by paying bribes to PDVSA officials.").[20]

    2.    <u>PLS And Testino Conspired To Associate With An Enterprise Engaged In Racketeering Activity</u>

Under 18 U.S.C. § 1962(d), it is also unlawful for any person to *conspire* to violate 18 U.S.C. § 1962(c). "The elements of a conspiracy under § 1962(d) are simply (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the *overall objective* of the RICO offense." *United States v. Rosenthal*, 805 F.3d 523, 530 (5th Cir. 2015) (emphasis in the original) (internal citations and quotation marks omitted); *see also Aetna Inc. v. People's Choice Hosp., LLC*, No. SA-18-CV-00323-OLG, 2019 WL 12536916, at *17 (W.D. Tex. Mar. 28, 2019) (citing to *Rosenthal* for the elements of conspiracy under § 1962(d) in a civil case). Here, CITGO has pleaded, and Defendants have conceded, that both Defendants agreed to commit

---

[19] PDVSA is defined in the Information to include CITGO.

[20] PDVSA is defined in the Information to include CITGO.

substantive RICO offenses (violations of the Travel Act, Texas's commercial bribery law, and a federal money laundering statute) and agreed with the objective of the RICO offenses, namely the enrichment of Testino-controlled companies, including PLS, and thereby the enrichment of Testino.  Compl. ¶¶ 68–74, 109–110.  These actions manifested in the commission of the RICO offenses (*i.e.*, the goal of the conspiracy was achieved), leading directly to CITGO's injuries under the but-for and proximate cause tests.  Compl. ¶¶ 73–74; *see also* Ex. 3 ¶¶ 39–40 (count two charging Testino with an FCPA anti-bribery violation); Minute Entry for Testino Guilty Plea (pleading guilty to all counts, including the FCPA charge).

## VI.  Remedies:  CITGO Has Met Its Burden Demonstrating That It Is Entitled To Compensatory And Treble Damages

"The plaintiff must demonstrate with 'reasonable certainty' the amount of damages that she is entitled to." *Bullock v. Abbott & Ross Credit Servs., L.L.C.*, No. A-09-CV-413 LY, 2009 WL 4598330, at *2 (W.D. Tex. Dec. 3, 2009) (quoting *Credit Lyonnais Sec. (USA) v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).  "The plaintiff may not simply summarily provide the Court with a figure without explanation." *Malibu Media, LLC v. Dhandapani*, No. 3:19-CV-01300-M, 2020 WL 6120175, at *2 (N.D. Tex. Feb. 12, 2020).  Damages must be established with facts provided through affidavits, declarations, documents, deposition transcripts, or an evidentiary hearing.  *Id.* at *2–3; *see also Gross v. RSJ Int'l, LLC*, No. 11-cv-73, 2012 WL 729955, at *4–6 (E.D. La. Mar. 6, 2012) (finding that affidavits and supporting documents, including a budget and receipts, established breach of contract damages with reasonable certainty); *Copeland v. Alamo Billing Co.*, No. 4:20-

CV-00393-SDJ-CAN, 2021 WL 7500786, at *3, 6 (E.D. Tex. Dec. 17, 2021) (unliquidated damages can be supported by affidavit or declaration); *DeLeon v. Cantrell*, No. 7:16-cv-00038-O-BP, 2018 WL 6033261, at *3 (N.D. Tex. Nov. 1, 2018) (evidence in support of motion for default judgment included deposition transcripts).  CITGO respectfully submits that the detailed declarations and documents developed during discovery, and attached as Exhibits to this Motion, are more than sufficient to satisfy the burden of proof with respect to damages.

### A.   CITGO Is Entitled To Monetary Damages As A Result Of PLS And Testino's Breaches Of Contract, Fraud, And RICO Violations

As set forth in the Complaint, CITGO is seeking compensatory damages—in this case, damages equal to the amount that PLS and Testino's other businesses overcharged CITGO for the goods and services they provided—with respect to CITGO's breach of contract and fraud claims.  Compl. ¶¶ 80, 84, 88, 96.  With respect to its RICO claims, CITGO seeks treble damages, which, in this case, equates to a tripling of CITGO's compensatory damages.[21]  *Id*. ¶¶ 107, 112.

CITGO engaged damages expert James V. Farrell of the Berkeley Research Group to calculate the damages CITGO sustained due to PLS's and Testino's misconduct.  Based on Farrell's calculations, CITGO requests a total of $84.8 million in compensatory

---

[21] In its Complaint, CITGO also sought punitive damages in relation to its fraud claim.  *Id*. ¶ 96.  As described in Section VI.A.3., under Texas law, CITGO cannot seek both punitive damages and treble damages under RICO.  CITGO therefore elects to receive treble damages, as discussed in Section VI.A.3.

damages, which, under RICO, is trebled to $254.4 million.  CITGO requests an additional

$80.9 million in prejudgment interest as allowed under Texas law.

    1.    <u>CITGO Is Entitled To Compensatory Damages Under Its Breach Of Contract, Fraud, And RICO Claims</u>

Defendants' extensive bribery scheme caused CITGO to suffer compensatory

damages amounting to $84.8 million, as set out in Farrell's expert report (Ex. 10) and

detailed *infra*.

A successful plaintiff in a breach of contract action is entitled to compensatory

damages, which protect three interests: an expectation interest, a reliance interest, and a

restitution interest.  *Qaddura v. Indo-Eur. Foods, Inc*., 141 S.W.3d 882, 888 (Tex. App.

2004).  Damages that protect the expectation interest "seek[] to restore the non-breaching

party to the same economic position in which it would have been had the contract not been

breached."  *Id.* at 888–89.  Expectation damages are measured by determining "what

additions to the injured party's wealth have been prevented by the breach and *what

subtractions from his wealth have been caused by it*."  *Lafarge Corp. v. Wolff, Inc.*, 977

S.W.2d 181, 187 (Tex. App. 1998) (emphasis added).   In fraud cases, out-of-pocket

damages, which "measure the difference between the value of that with which the plaintiff

parted and the value of that which [the plaintiff] received," are the most common measure

of compensatory damages.  *Ghosh v. Grover*, 412 S.W.3d 749, 757 (Tex. App. 2013).

Similarly, plaintiffs can recover damages under RICO for an economic loss caused by the

RICO violation.  *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 408

(5th Cir. 2015).

As a result of PLS's breaches of the contract, its fraud, and Defendants' RICO violations, CITGO paid PLS and other Testino-affiliated entities significantly inflated prices.  CITGO would not have paid such prices, which far exceeded the fair market value of the goods and services provided, were it not for Defendants' conduct.  This included the inflated prices CITGO paid for (1) PLS's commissions for its services; (2) the goods and services PLS purchased from PLS- and Testino-affiliated entities; and (3) the delivery expenses incurred by PLS but billed to CITGO.  As damages for PLS's breaches of the Agreement, the fraud perpetrated by PLS, or PLS's and Testino's RICO violations, CITGO should receive damages in the amount of what it paid for the above-described goods and services less the fair market value of those goods and services.[22]

Courts have significant discretion in determining what constitutes appropriate damages awards, and damages calculations "'need not be proved with [an] exact degree of specificity.  It suffices if a state of facts is shown from which a court or jury can find with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred' due to the injury." *Transcon. Gas Pipe Line Corp. v. Societe D'Exploitation du Solitaire SA*, 299 F. App'x 347, 350 (5th Cir. 2008); *see also Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 706 (S.D. Tex. 2013) ("[o]nce the existence of damages has been shown, all that an award of damages requires is substantial

---

[22] Once calculated, CITGO is entitled to a trebling of its damages under RICO.  CITGO could also receive punitive damages under Texas law.  Both of these issues are discussed *infra* Section VI.A.3.

evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages") (citations omitted).

Moreover, if a defendant's "wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff," the defendant "is not entitled to complain that [the damages] cannot be measured with the same exactness and precision as would otherwise be possible." *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379 (1927); *see also Comex Int'l v. Norfolk S. Ry. Co.*, No. 04-cv-3637, 2006 WL 355230, at *5 (S.D. Tex. Feb. 14, 2006) ("[o]nce the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification") (quoting *Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 658 (7th Cir. 2004)).

Courts regularly approve damages calculations based on estimates and experts' models. For example, in *Apogee Telecom, Inc. v. Dungan*, Apogee Telecom, Inc. ("Apogee") allegedly hired Robert John Dungan, II to act as a representative for Apogee with the duties of identifying contractors to hire to complete aspects of Apogee's projects. No. 16-cv-00061, 2016 WL 9308329, at *1 (W.D. Tex. Sept. 23, 2016). In this role, Dungan allegedly directed business to two companies he owned and that acted as competitors to Apogee. *Id.* Apogee sued Dungan and his companies for fraud and civil conspiracy. *Id.* Eventually, the court found Dungan in default, and Apogee moved for a default judgment on its fraud claims.[23] *Id.* at *2. In ruling upon that motion, the U.S.

---

[23] Because the civil conspiracy claim involved other defendants, the Court interpreted Apogee's motion for default judgment as seeking judgment only on the fraud claims, and

District Court for the Western District of Texas determined that an estimated average markup on all improperly awarded contracts was a proper method of calculating damages and awarded the full amount of damages claimed by the plaintiffs.  *Id.* at *6.

Similarly, in *Gil Ramirez Group, L.L.C. v. Houston Independent School District*, the plaintiffs sued, among others, a trustee of the Houston Independent School District (Lawrence Marshall) and claimed that in order to win business with the school district, companies were required to pay bribes to Marshall via a consulting company.  No. 4:10-cv-04872, 2017 WL 3236110, at *1 (S.D. Tex. July 31, 2017).  Plaintiffs alleged RICO and tortious interference claims, and an expert estimated damages using "several different models."  *Id.* at *2, 12.  The court noted that:

> The general rule that: "damages are not permitted which are remote and speculative in nature . . . serves to preclude recovery, however, only where the *fact* of damage is uncertain, *i.e.*, where the damage claimed is not the certain result of the wrong, not where the *amount* of damage alone is uncertain. . . ."

*Id.* at *12 (quoting *Clearline Techs. Ltd.*, 948 F. Supp. 2d at 706) (emphasis in original). The court concluded that the jury could have properly reached its damages award based on the expert's testimony and conclusions.  *Id.*

Likewise, in *Cooper v. Faith Shipping*, a plaintiff submitted a report from an economic expert in support of the plaintiff's motion for default judgment.  No. 06-cv-892,

---

the court deferred any ruling on the civil conspiracy claim until there was "further factual development of the record."  *Apogee Telecom*, 2016 WL 9308329, at *2 n.1.  The Court proceeded to issue a judgment as to the fraud claims under FRCP 54.  *Id.*

2009 WL 1789405, at *4 (E.D. La. June 22, 2009).  The expert calculated the plaintiff's likely future lost earnings based on a model of his life expectancy and other factors.  *Id.* The court reviewed and accepted the expert's calculations, awarding the plaintiff the amount calculated by the expert.  *Id.*

        a.      *CITGO Suffered $84.8 Million In Compensatory Damages Caused By Defendants' Bribery Scheme*

CITGO engaged James V. Farrell of the Berkeley Research Group to calculate the total damages CITGO sustained as a result of PLS's and Testino's bribery scheme, based on CITGO's investigative findings as of the date of this filing.  Farrell is qualified to serve as an expert in calculating the damages CITGO suffered.  As detailed in his resume, which is attached as Ex. 10 at Schedule A, he is a certified public accountant with over thirty years of experience.  He holds a B.S. in Accounting from Oregon State University, and an MBA in Economics from the University of Chicago.  He has served as an expert in over 40 cases and arbitrations, and authored articles and presented at seminars relating to damages calculations.  He specializes in calculating damages in cases involving fraud and RICO violations.  His report relies upon standard accounting principles and methods recognized by those in his field as objective and reliable, and he applied those principles and methods to the facts developed during discovery.  Ex. 10 ¶¶ 6–9, at Schedule A.

Farrell based his calculations on the evidence obtained through third-party discovery, the related criminal proceedings against Testino and his co-conspirators, and CITGO's own records.  Documents reviewed include the Agreement, transcripts from depositions, emails and documents produced in third-party discovery relating to improper

markups and bribes paid, a signed declaration, and internal CITGO finance and audit records.  *See id.* at Schedule B.

Farrell's calculations of compensatory damages can be broken down into three categories: the inflated prices CITGO was defrauded into paying (1) Testino-controlled entities for goods; (2) PLS as commissions; and (3) PLS for delivery and other reimbursable expenses.

        i.      Inflated Prices Defendants Caused CITGO To Pay To Testino-Controlled Entities for Goods

Farrell concluded that Defendants caused CITGO to pay, at a minimum, $72,461,343 in inflated prices for goods purchased from Testino-controlled entities.  As described in further detail in Farrell's expert report, in order to calculate this amount, Farrell reviewed documents identifying the entities that Testino controlled, as well as CITGO's purchase orders and related documents to identify procurements with suppliers controlled by Testino.  *Id.* ¶¶ 36–41.  These equipment suppliers include All Two Corp., Ameritraders, Aziolarefin Olie Energie & Fabricage, Barthelo BV, Distribudora Gasu, Drill Corp., Lexington Tech International, Petroleum Equipment Petequip Corp., Rexel Consolidated, Inc., SGL Technic, South Am Corp., Stang Industrial Products, and Worldwide Ironcarb.  *Id.* at Schedule C; *see also* Ex. 6 ¶ 6 (a declaration from ▮▮▮▮ describing each of these, except Barthelo, Distribudora Gasu, and Rexel, as vendors controlled by Testino); Ex. 7 at 36, 47–54, 59, 73–74 (deposition from former PLS employee Ruben Gonzalez that Lexington Tech International, Petroleum Equipment Petequip Corp., Rexel Consolidated, Inc., SGL Technic, and Stang Industrial Products were

affiliated with Testino); Ex. 22 (a list of contacts for entities controlled by Testino, including All Two Corp., Ameritraders, Aziolarefin, Barthelo, "Gasu" (Distribudora Gasu), Petequip, Rexel, SGL Technic, Stang, and South Am Corp.); Ex. 17 (declaration of former Shareholder Procurement buyer Pena that Testino owned and/or controlled All Two Corp., Aziolarefin Olie Energie & Fabricage, Drill Corp., Lexington Tech International, Petroleum Equipment Petequip Corp., Rexel Consolidated, Inc., SGL Technic, Stang Industrial Products, and Worldwide Ironcarb).

The CITGO Shareholder Procurement Department worked on 42 procurement projects.  Ex. 10 ¶ 39.  Projects ranged from single, one-time procurement transactions to large-scale, long-term projects involving dozens or hundreds of transactions.  Ex. 23.[24] Some projects involved only one procurement vendor and one logistics company, whereas others involved dozens of procurement vendors and multiple logistics companies.  In reviewing the documentation, of those 42 projects, Farrell identified 21 in which PLS was contracted to provide logistics services.  Ex. 10 ¶ 39.  Within these 21 projects, Farrell identified 31 transactions[25] with Testino-controlled entities for a total value of **$107,445,628.29**.  *Id*. at Schedule C.

---

[24] For example, the "E&P Coiled Lift Systems" project involved PLS and just one Testino-controlled vendor providing goods, Drill Corp.; the "El Palito 2015-2016 Turn Around" project involved over 40 vendors, including All Two, Aziolarefin, Lexington Tech, and SGL Technic, and PLS was engaged to provide logistics services.  *Id.*

[25] Again, because certain projects had multiple transactions, the number of transactions is greater than the number of projects.

Farrell next calculated how much Testino's equipment suppliers overcharged CITGO on these transactions. *Id.* ¶¶ 41–54. Given the nature of the bribery scheme, PLS and the other Testino-controlled companies deliberately hid the true value of the goods CITGO purchased so that they could extract inflated prices from CITGO. In addition, PLS's and Testino's refusal to appear in this case and to participate in discovery meant that information as to the cost of goods purchased was difficult to obtain. Therefore, to calculate how inflated the prices charged by the Testino-controlled entities were, Farrell utilized certain documents obtained through third-party discovery, as well as CITGO's own accounting and internal audit files, which allowed him to identify the specific markups on certain transactions with Testino entities. *Id.* These documents included emails, spreadsheets, and other documents from former PLS employees that reflected markups over 50% of the value of the purchased goods, with some markups exceeding 200%. *Id.* For example, email correspondence showed that the Testino-controlled entity Petequip was awarded a purchase order and charged $302,293.10, despite incurring only $159,892 in costs, an 89% markup. *Id.* ¶ 32; *see also* Ex. 27.

Farrell also relied upon documents from CITGO's Internal Audit Department, which had, after the fact, identified similar markups on transactions with Testino-controlled entities. Ex. 10 ¶¶ 41–54; *see also* Ex. 21 (CITGO's audit of transactions with Rexel, which found an improper markup of 91%). In addition, Farrell relied on the sworn statement from ███████████████████████████████████████ and who stated that Testino-controlled entities "regularly" marked up equipment sold to CITGO by 400% to 500%. Ex. 10 ¶ 27; Ex. 6 ¶ 12.

Based on that evidence, Farrell determined that, on average,[26] CITGO paid 67.4% above market value for the goods that CITGO purchased from Testino-controlled entities. Ex. 10 ¶¶ 50–53.[27]  He then applied that average markup rate to the transactions where CITGO purchased from a Testino-controlled entity.  *Id.*  He thus concluded that the Testino suppliers overcharged CITGO by **$72,461,343**.  *Id.* ¶ 53.

### ii.    Inflated Commissions Paid By CITGO

Farrell determined that PLS's commission rate was significantly higher than the fair market rate.  As discussed above, PLS secured the Agreement with bribery, and therefore PLS was able to charge a rate substantially higher than market value.  Prior to PLS being engaged, another company had provided logistics services for similar purchases, and CITGO is unaware of evidence demonstrating that the company's rate was secured by bribery.  That company's rate was on a sliding scale: 3% for under $10 million; 2.5% for over $10 million but under $20 million; and 2% for over $20 million.  *Id.* ¶ 57.  Separately, ███ sworn declaration stated that PLS subcontracted the logistics and transportation work for 1% to 2% of the purchase price.  *Id.* ¶ 58.  Given these facts, Farrell determined that 3% was a conservative fair market rate for providing logistics services on these types of purchases (the highest rate charged by the prior logistics vendor), which meant CITGO

---

[26] Courts regularly approve damages calculations based on estimates and experts' models.  *See supra* Section VI.A.1.; *see also Gil Ramirez Grp.*, 2017 WL 3236110, at *12; *Apogee Telecom*, 2016 WL 9308329, at *6; *Cooper*, 2009 WL 1789405, at *4.

[27] Given that several documents reflected larger markups for specific transactions and that in a sworn statement ███ testified the markups were significantly larger, Farrell concluded 67.4% was a conservative estimate.  Ex. 10 ¶ 54.

overpaid at a rate of at least 2.75% (5.75% – 3%).  *Id*. ¶¶ 59–62.  This was 47.83% above fair market value (2.75% / 5.75%).  *Id*. ¶ 63.  Farrell applied the 47.83% markup to the total amount PLS was paid in commission.  *Id*. ¶¶ 64–65.  According to a spreadsheet created by the CITGO Finance Department in the ordinary course of business, PLS was paid $21,617,443.10 in both commissions and delivery/reimbursable expenses.  *Id*.  Farrell analyzed several CITGO purchase orders and related PLS invoices, and estimated that of this $21,617,443.10, 65% was commissions to PLS (or $14,051,338.02), with the remaining 35% going towards the delivery/reimbursable expenses.  *Id*.  He then multiplied the $14,051,338.02 in commissions by the amount of overcharging (47.83%), which comes to $6,720,205.14.  *Id*.  He further adjusted this figure to account for one purchase order where CITGO and PLS agreed that PLS would receive a commission of 4% of the purchase order.  *Id*.  After this adjustment, Farrell arrived at $6,389,105.14 in damages resulting solely from the inflated commission rate CITGO paid PLS.  *Id*.

However, this alone does not fully account for PLS's inflated commissions. Although Farrell assumed that 3% was a fair commission rate, CITGO should not have paid <u>any</u> commission on the improper markup charged on goods by the Testino-controlled entities (the 3% rate should have only applied to the fair market value of the goods).  *Id*. ¶ 66.  For example, using the above Petequip example for illustrative purposes, Petequip was awarded a purchase order for which Petequip's cost was $159,892.  However, Petequip charged CITGO $302,293.10, an 89% markup.  PLS's commission of 5.75% was charged on that $302,293.10, which means PLS received $17,381.85 in commissions (5.75% x $302,293.10).  Because Farrell determined that 3% was a fair rate for the

commission, CITGO overpaid by $8,313.06 (2.75% x $302,293.10). But, as reflected above, PLS was also earning commission on the improperly marked up Petequip price, as Petequip marked up its price by 89%. CITGO should have only paid 3% on Petequip's cost of $159,892, not the inflated cost of $302,293.10. Thus, because of the inflated price Petequip charged, PLS's commission was inflated by an additional $4,272.03 ((($302,293.10 – $159,892) x 3%) or ($142,401.10 x 3%)). In other words, for this one transaction, PLS's commission was inflated because it charged a commission 2.75 percentage points above the market rate ($8,313.06) and because a portion of what would have been a fair market commission rate of 3% was charged on the inflated price Petequip charged, resulting in an overcharge of $12,585.09 ($8,313.06 + $4,272.03).

Farrell therefore multiplied 3% and the amount of the improper markup ($72,461,343.00), calculating an additional $2,173,840.29 in damages. *See id.* ¶ 66, at Schedule C. Farrell thus concluded that Defendants' bribery scheme caused CITGO to pay a total of **$8,562,945.43** in inflated commissions to PLS ($6,389,105.14 + $2,173,840.29). *Id*. ¶¶ 65–67, at Schedule C.

### iii. Inflated Reimbursable Expenses Paid By CITGO

Lastly, under the Agreement, PLS was entitled to charge CITGO for certain related services (*e.g.*, warehousing, packing, and delivery) for which PLS contracted with another vendor. Ex. 9 ¶ 5, at Ex. B. These expenses were to be charged to CITGO at cost, with PLS providing the invoices to support the expenses charged. *Id*. However, Farrell concluded that, based on the evidence, Defendants inflated these expenses. First, Testino or co-conspirators controlled several of the entities providing these reimbursable services,

such as Lighthouse Forwarding Corp. and United Trading International, which, given Testino's other conduct, likely means the invoices presented by these vendors were inflated.  Ex. 15 at 19–22, 36–38, 151–54.  Second, Tulio Farias, one of Defendants' co-conspirators, wrote in a March 2014 email:

> [W]e know that the logistics service is not the only % that is charged, but there are reimbursable expenses that can take this charge up to 50% of the total invoice.  So I'm going to contact the operative on that side to discuss how we can get the most out of the business all around.

Ex. 16.  Based on this, Farrell estimated that the reimbursable expenses were marked up by at least 50%.  Ex. 10  ¶¶ 68–70.  As described above, he estimated that reimbursable/delivery expenses were 35% of the total amount paid to PLS, which is $7,566,105.09 ($21,617,443.10 x 35%).  *Id.* ¶ 70.  Therefore, he concluded that half of that amount, or **$3,783,052.54**, was damages to CITGO.  *Id.*

In total, Farrell determined that as a result of Defendants' bribery scheme, CITGO suffered **$84,807,340.97** in compensatory damages ($72,461,343 + $8,562,945.43 + $3,783,052.54).  *Id*. ¶ 72.  Moreover, this figure significantly understates the damages incurred by CITGO because it includes only the projects with Testino-controlled entities that involved PLS.  In other words, this damages figure does ***not*** include transactions between CITGO and other Testino-controlled entities where PLS was ***not*** involved in the project.  As a result of this and the other assumptions discussed in this section, CITGO's claimed damages of $84,807,340.97 represents a conservative calculation.

2. <u>CITGO Is Entitled To Treble Damages Under RICO From Both PLS And Testino</u>

The civil remedies provision of RICO provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter . . . *shall* recover threefold the damages he sustains."  18 U.S.C. § 1964(c) (emphasis added).  An award of treble damages is therefore mandatory upon a finding of RICO liability. *TransFirst Holdings, Inc. v. Phillips*, No. 3:06-CV-2303-P, 2010 WL 11537522, at *28 (N.D. Tex. Jan. 19, 2010) ("Having found RICO liability . . . the Court *must* treble Plaintiffs' actual damages.") (emphasis added).

In this case, as described above, CITGO has properly pleaded PLS's and Testino's liability under RICO, and Defendants have conceded liability due to their default.  CITGO has also established that PLS's and Testino's RICO violations caused $84,807,340.97 in damages.  If the Court agrees that is the amount of damages, then under RICO, the Court <u>must</u> treble that amount, resulting in damages of $254,422,022.91 against PLS.[28]

3. <u>CITGO Elects To Receive Treble Damages Against PLS Under RICO</u>

Texas law generally prohibits a plaintiff from "obtaining more than one recovery for the same injury." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991).  This "one satisfaction" rule prohibits plaintiffs from "mixing and matching" different damages elements from different theories of recovery.  *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1093–94 (5th Cir. 1996).  In such instances, the plaintiff must elect between the two

---

[28] Were the Court to conclude the damages were greater or less than $84,807,340.97, then RICO would require the Court to treble that figure.

damages theories.  *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 681 (5th

Cir. 2016).

Because CITGO sustained one injury, it can only receive actual damages under its

breach of contract, fraud, or RICO claims.  Given the mandatory trebling of actual damages

required by RICO, CITGO elects that it receive trebled damages under RICO, which would

be **$254,422,022.91** ($84,807,340.97 x 3).[29]  PLS, Testino, and other participants in the

RICO enterprise are jointly and severally liable for these damages.  *Harris Cnty. v. Eli Lilly

& Co.*, No. CV H-19-4994, 2020 WL 5803483, at *7 n.10 (S.D. Tex. Sept. 29, 2020)

("Participants in a RICO enterprise are jointly and severally liable for the acts of any

member of the enterprise.") (citing *United States v. Edwards*, 303 F.3d 606, 643 (5th Cir.

2002)).

---

[29] Under Texas law, in addition to compensatory damages, a plaintiff claiming fraud may
recover punitive damages (which are also commonly referred to as "exemplary" damages).
Tex. Civ. Prac. & Rem. Code Ann. §§ 41.003(a), (b).  This is true even as part of, as here,
a no-answer default judgment for fraud, so long as all facts of the fraud are properly
pleaded.  *Ontario Produce, LLC v. Whitlock*, No. 13-19-00585-CV, 2021 WL 1045805, at
*8 (Tex. App. Mar. 18, 2021).  However, because Texas law does not allow "mixing and
matching" different damages theories, CITGO cannot seek both punitive damages under
its fraud claim and treble damages under RICO.  Given that trebling is mandatory under
RICO, CITGO elects damages under RICO.  Should the Court decline to award treble
damages, CITGO "has a right to a judgment on the theory entitling [it] to the greatest or
most favorable relief."  *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787
(Tex. 1988).  CITGO therefore reserves the right to modify any election of remedies based
upon future events in this litigation, including in any appeal.  *See Malvino v. Delluniversita*,
840 F.3d 223, 233 (5th Cir. 2016).

4.    CITGO Is Entitled To Prejudgment Interest On Its RICO Damages

Where a cause of action arises out of federal law, as is the case with CITGO's RICO

claims, federal law governs the availability and rate of prejudgment interest.[30] *Hansen v.*

*Cont'l Ins. Co.*, 940 F.2d 971, 983 (5th Cir. 1991), *abrogated on other grounds by CIGNA*

*Corp. v. Amara*, 563 U.S. 421 (2011).  If the federal statute that is the basis for monetary

damages awarded by the court is silent on the issue of prejudgment interest, the Fifth

Circuit has a "strong presumption in favor of awarding pre-judgment interest." *Plambeck*,

802 F.3d at 679 (quoting *United States v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th

Cir. 2001)).  Indeed, the Fifth Circuit has exhorted that "[c]ourts should award prejudgment

interest whenever a certain sum is involved" because "[r]efusing to award prejudgment

interest ignores the time value of money and fails to make the plaintiff whole." *Thomas v.*

*Tex. Dep't of Crim. Just.*, 297 F.3d 361, 372 (5th Cir. 2002); *see also Lowe v. Eltan, B.V.*,

No. 9:05-CV-38, 2019 WL 493806, at *4 (E.D. Tex. Feb. 8, 2019) (awarding prejudgment

interest on RICO claims).

The RICO statute does not mandate that a specific interest rate be used for

prejudgment interest.  *See generally* 18 U.S.C. §§ 1961–1968.  In such situations, the Fifth

Circuit has stated that state law is "an appropriate source of guidance" for determining the

---

[30] Because CITGO has elected to receive actual damages under its RICO claim, CITGO only briefs the calculation of prejudgment interest on that type of claim.  CITGO does not brief the calculation of prejudgment interest under its fraud or breach of contract claims. Should the Court not grant CITGO a damages award in the amount and type CITGO is requesting, CITGO is prepared to submit supplemental briefing as to any alternative prejudgment interest calculations that may be necessary.  *See Malvino*, 840 F.3d at 233.

prejudgment interest rate, method of calculation, and date of accrual. *See Perez v. Bruister*, 823 F.3d 250, 274 (5th Cir. 2016); *Hansen*, 940 F.2d at 984 (quoting *United States ex rel. Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987)). That said, the district court retains discretion to set what it feels is an equitable interest rate. *Hansen*, 940 F.2d at 984.

Turning to Texas law, prejudgment interest accrues at the rate of post-judgment interest and is calculated as simple (*i.e.*, not compound) interest accruing per annum. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998); *see also Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 415 (5th Cir. 2011) (citing *Johnson & Higgins* for the calculation of prejudgment interest); *Arete Partners, L.P. v. Gunnerman*, No. A-05-CA-921-SS, 2010 WL 11614545, at *1 (W.D. Tex. June 23, 2010). This rate is set by statute, specifically Tex. Fin. Code Ann. § 304.003, and is the prime rate published by the Federal Reserve on the date of computation (*i.e.*, the date the court calculates the interest as part of its judgment), with a floor of five percent and a ceiling of fifteen percent. *Arete Partners*, 643 F.3d at 415; *Johnson v. Sw. Rsch. Inst.*, 384 F. Supp. 3d 722, 727 (W.D. Tex. 2019). The prejudgment interest begins to accrue at either the earlier of the date the lawsuit was filed or 180 days after the defendant received written notice of a claim, and ends at the date of the Court's judgment. *Arete Partners*, 643 F.3d at 411, 414. Here, there was no written notice of a claim, so the appropriate accrual date is May 26, 2020. The interest should be calculated on the trebled damages. *Lowe*, 2019 WL 493806, at *4 (awarding prejudgment interest on the trebled amount of RICO damages). Thus, CITGO requests interest on $254,422,022.91 starting from May 26, 2020,

with the rate set by Tex. Fin. Code Ann. § 304.003, which as of the date of this filing would be calculated as 8.50%.[31]   Farrell calculated the amount of interest, following these requirements. Ex. 10 ¶ 71.  The result was prejudgment interest of **$80,934,085.15**. *Id.*

### B.   CITGO Should Receive Post-Judgment Interest On The Entire Judgment

In federal court, post-judgment interest is governed by 28 U.S.C. § 1961. *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 419 (5th Cir. 2017). Interest can be ordered "on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961.  This includes trebled damages and prejudgment interest. *Lowe*, 2019 WL 493806, at *4 ("all sums awarded shall accrue post-judgment interest," including trebled damages and prejudgment interest).

By statute, post-judgment interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961.  CITGO therefore requests that the Court award post-judgment interest on the full value of any money judgment the Court should enter in this case at the rate specified in 28 U.S.C. § 1961 and accruing from the date this Court enters judgment.

---

[31] The prime rate is currently 8.50%.  Selected Interest Rates (Daily) – H.15, Federal Reserve (Feb. 21, 2024), http://www.federalreserve.gov/releases/h15/.

## CONCLUSION

For the foregoing reasons, CITGO respectfully requests an order (a) entering a default judgment against Defendants, (b) holding Defendants liable for $84.8 million in compensatory damages, which are then trebled under RICO to $254.4 million, plus prejudgment interest on the trebled amount at the rate set by Tex. Fin. Code Ann. § 304.003, (c) awarding post-judgment interest on the entire monetary judgment at the rate specified in 28 U.S.C. § 1961 and accruing from the date this Court enters judgment, and (d) providing any such further relief that the Court deems just and proper.

Dated:  February 23, 2024

/s/ *Jennifer Hardy*
Jennifer Hardy
Attorney-in-Charge
Texas Bar No. 24096068
Southern District of Texas Bar No. 2828253
Willkie Farr & Gallagher LLP
600 Travis Street
Houston, TX 77002
Tel: (713) 510-1766
Fax: (713) 510-1799
JHardy2@willkie.com

Michael J. Gottlieb
Robert J. Meyer
Nicholas Reddick
Andrew English
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

*Attorneys for Plaintiff CITGO Petroleum Corporation*

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned hereby certifies that counsel for CITGO cannot confer with Defendants regarding this Motion as neither has made an appearance.

Dated: February 23, 2024

/s/ *Jennifer Hardy*
Jennifer Hardy
Attorney-in-Charge
Texas Bar No. 24096068
Southern District of Texas Bar No. 2828253
Willkie Farr & Gallagher LLP
600 Travis Street
Houston, TX 77002
Tel: (713) 510-1766
Fax: (713) 510-1799
JHardy2@willkie.com

Michael J. Gottlieb
Robert J. Meyer
Nicholas Reddick
Andrew English
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 303-1000
Fax: (202) 303-2000

*Attorneys for Plaintiff CITGO Petroleum Corporation*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. Civ. Proc. Rule 5 and S.D. Tex. Civ. L.R. 5.5, the undersigned certifies that I will arrange for true and correct copies of this Motion and its exhibits to be served via certified mail (return receipt requested) to Petroleum Logistics Service Corp. ("PLS") at its last known address, which is listed below.

In addition, I will arrange for true and correct copies of this Motion and its exhibits to be served via certified mail (return receipt requested) to PLS's agent for service of process in Texas, *i.e.*, the Texas Secretary of State. In accordance with Tex. Bus. Orgs. Code. Ann. § 5.251 and Tex. Civ. Prac. & Rem. Code Ann. § 17.044(b), the Texas Secretary of State "is an agent of an entity for purposes of service of process" if the foreign entity fails to register, maintain a regular place of business, or designate an agent for service of process as required. Under Tex. Admin. Code Ann. § 71.21(a) and Tex. R. Civ. P. 106, service on the Secretary of State as an agent for an entity that failed to register despite transacting business in Texas can be accomplished by sending via certified mail copies of the documents, as well as the names and appropriate addresses for the defendant. *See* Tex. R. Civ. Prac. & Rem. Ann. § 17.026.

Upon information and belief, PLS failed to appoint a service of process agent as required by Tex. Bus. Orgs. Code Ann. § 9.001 and Section 23 of the March 5, 2014 Service Contract Agreement between CITGO and PLS that is the subject of the instant litigation. I will arrange for transmission of this Motion and its exhibits to the Texas Secretary of State and provide the following proper "names" and "appropriate addresses" for PLS and its agents:

a.    PLS's corporate headquarters' last known address, located at Petroleum Logistics Service Corp., Trump Office Tower, 2nd floor, Office 2-06, Punta Pacifica, Panama City, Panama with attention to PLS's Managing Agent;

b.    PLS's agent on corporate filings in Panama, Fabrega, Molino, and Mulino, located at BMW Plaza, 9th Floor, 50 St. P.O. Box: 0816-00744, Panama, Rep. of Panama; and

c.    PLS's President Jaymy Dominguez, at her home address located at PH Riverside, Piso 23, Apto. 23A, Calle 5ta, Parque Lefevre y via Espana, Parque Lefevre, Panama.

With respect to Testino, he died on March 1, 2023.  A curator for his estate, Paul M. Cowan, was appointed on September 26, 2023.  I will cause to be sent a true and correct copy of this Motion and its exhibits via certified mail (return receipt requested) to Cowan at the following address:

Paul M. Cowan & Associates, P.A.
Oak Park Professional Center
8925 SW 148th St., Ste. 100
Palmetto Bay, FL 33176-8000

Dated: February 23, 2024              By:      /s/ *Jennifer Hardy*

Jennifer Hardy
Attorney-in-Charge
Texas Bar No. 24096068
S.D. Tex. Bar No. 2828253
Willkie Farr & Gallagher LLP
600 Travis Street
Houston, TX 77002
Tel: (713) 510-1766
Fax: (713) 510-1799
jhardy2@willkie.com

*Attorney for Plaintiff CITGO Petroleum Corporation*

- 78 -